IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| Remnant Oil Company, LLC and | § | Case No. 19-70106 |
| Remnant Oil Operating, LLC, | § § | Case No. 19-70107 |
| Debtors. | § § | Chapter 11 |
| | § § | (Jointly Administered) |
| | § | |

# MOTION TO CONVERT CASES TO CHAPTER 7

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**

**IF NO TIMELY RESPONSE IS FILED WITHIN 21 DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**

**A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

Kodiak Gas Services, LLC ("Kodiak"), together with Baker Hughes Oilfield Operations, LLC ("BHOO") and Baker Petrolite LLC ("Petrolite" and collectively with BHOO and Kodiak, "Movants") creditors and parties-in-interest in the above-referenced bankruptcy cases hereby move this Court (the "Motion") to convert these chapter 11 cases to cases under chapter 7 pursuant to section 1112(b) of Title 11 of the United States Code (the "Bankruptcy Code"). In support of the Motion, Movants would respectfully state as follows:

## I.
## PRELIMINARY STATEMENT

1. Cause exists to convert these cases to cases under chapter 7 because Debtors[1] have been grossly mismanaged, Debtors are experiencing substantial and continuing losses, it is

---
[1] "Debtors" are, collectively, Remnant Oil Company, LLC and Remnant Oil Operating, LLC.

unlikely that the Debtors' business can be rehabilitated, and current management is conflicted. As explained below:

a. Debtors have always been insolvent;

b. Debtors have incurred over $1 million in post-petition secured debt and are no closer to a sale of assets or consummation of a plan of reorganization than they were on the date of filing;

c. Debtors will run out of money at the end of this month;

d. Current management seeks to pay insider equity contributions as legitimate debt and received significant transfers of money in the one-year prior to bankruptcy; and

e. Debtors' marketing efforts have been unmitigated failures.

In short, Debtors have no viable path forward and should not be permitted to continue to gamble with creditors' money. For these reasons and those that will be established at trial, the Court should grant this Motion and convert this case to one under chapter 7 of the United States Bankruptcy Code.

## II.
## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.  Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory basis for the relief requested herein is section 1112(b) of the Bankruptcy Code.

## III.
## BACKGROUND

4.  On July 16, 2019 (the "Petition Date"), Debtors filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Midland Division (the "Court").

5. Debtors have operated and "managed" their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

6. On July 29, 2019, Debtors filed their first motion for DIP financing, requesting approval of a $350,000 non-priming post-petition secured loan from insider Reed Gilmore (Docket No. 50) (the "First DIP"). The First DIP was approved by the Court on August 8, 2019 (Docket No. 71).

7. On August 30, 2019, Debtors filed their second motion for DIP financing, requesting approval of a post-petition multiple draw facility in the amount of $750,000 (Docket No. 100) (the "Second DIP"). The Second DIP was approved by the Court on September 9, 2019 (Docket No. 132).

8. Debtors employed Seaport Global Securities as investment banker to market and sell Debtors' Caprock Property (Docket No. 158) and filed their *Motion to Approve Bidding Procedures and Selection of a Stocking Horse Bidder and Authorizing the Sale of Assets* (Docket No. 95). The bid date has come and gone without any qualified bids being submitted.

9. On October 23, 2019, the Unsecured Creditor Committee, along with Kodiak and Baker Hughes, conducted a 2004 Exam of Mr. E. Will Gray, II, as representative on behalf of the Debtors. *See* October 23, 2019 Transcript of 2004 Examination, attached as **Exhibit 1**.

10. Debtors' bankruptcy cases are currently managed by Debtors as debtors-in-possession and have not been previously converted from another chapter of Title 11. *See* L. Rule 1017.

### IV.
### ARGUMENT & AUTHORITY

11. Legal Standard. Section 1112(b) of the Bankruptcy Code provides that, on request

of a party in interest, and after notice and a hearing, "the Court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, upon cause . . .". 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) of the Bankruptcy Code lists non-exclusive grounds that constitute "cause" for dismissal or conversion, including:

- "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;"

- "gross mismanagement of the estate;" and

- "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter."

11 U.S.C. § 1112(b)(4)(A), (B), and (F); *see also In re Israel Sand, LLC*, 569 B.R. 433, 439 (Bankr. S.D. Tex. 2017); *Matter of Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986). As explained below, cause exists to convert these bankruptcy cases on each of the above-referenced grounds.

A. ***Substantial and Continuing Loss to the Estates.***

12. Cause exists to dismiss these bankruptcy cases because, *inter alia*, there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Section 1112(b)(4)(A) involves a two-pronged analysis: "First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing." *Nester v. Gateway Access Solutions, Inc.* (*In re Gateway Access Solutions, Inc.*), 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007); *see also In re TMT Procurement Corp.*, 534 B.R. 912, 919 (Bankr. S.D. Tex. 2015).

13. At Debtors' recent 2004 examination, Debtors' Chief Executive Officer, Will Gray, admitted to substantial and continuing losses during bankruptcy. Mr. Gray explained that Debtors

4

own the following properties:

- Caprock Property, consisting of interests in oil and gas leases, water rights, and a $CO_2$ pipeline (the "Caprock Property");

- Wind rights; and

- Non-Caprock Property including interests in (i) five "waterflood" oil and gas units, including the North Square Lake Unit, South Red Lake II Unit, Hackberry Unit, Turkey Track Unit, and Lusk Seven Rivers Unit, (ii) "17,000 acres of approximately dry gas in the Pecos slope area," and (iii) "approximately 45 individual kind of one-off wells scattered amongst Eddy, Lea, and Chaves counties in New Mexico" (collectively, the "Non-Caprock Property")

*See* Ex. 1 at pp. 77:2-80:20. Mr. Gray testified that Debtors (i) are operating their Caprock Property at "a burn rate of probably of about $70,000 a month" and (ii) do not expect to receive any revenue from their wind rights until "Q3 2020." *Id.* at 262:24-25; 51:25. Mr. Gray also testified that Debtors' Non-Caprock Property produces "approximately 125 gross barrels a day" but that Debtors' only "cash flow positive" property is the North Square Lake Unit, which is "probably throwing off 20 to 25,000 a month right now." *Id.* at pp. 264:5-265:3. Based on Debtors' 2004 testimony, Debtors have lost at least $45,000 per month during bankruptcy without accounting for overhead expenses such as salaries and rent, much less the $1 million in new DIP debt and bankruptcy administrative expenses.[2] Debtors' negative cash flow, alone, is cause for conversion. *See In re TMT Procurement Corp.*, 534 B.R. at 918 ("Negative cash flow alone can be sufficient cause to dismiss or convert under § 1112(b).").

14. In the context of these bankruptcy cases, however, Debtors' losses are substantial. A substantial loss is one that "is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors." *Id.* In *TMT*,

---

[2] Debtors have not filed any monthly operating reports. Had Debtors complied with their obligations to file monthly operating reports, creditors could have identified Debtors' financial morass at an earlier point.

5

that court found "substantial loss" where those debtors (i) "incurred significant operational losses over the life of the case," (ii) "cash on hand had declined," and (iii) "the Debtors have struggled to pay expenses as they come due." *Id*. at 919. The situation is similar here. As explained above, the 2004 testimony proves that Debtors have lost money each month since filing their bankruptcy cases. Mr. Gray further testified that Debtors will run out of any cash to operate in December. *See* Ex. 1 at pp. 157:25-158:6 ("We could last until the—until the DIP is due" in early December 2019); *see also Debtors' Expedited Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 363, 554 and 105(A) Approving Procedures for the Sale, Transfer, or Abandonment of certain De Minimis Property* at Dkt. No. 217 in Case No. 19-70106 (seeking the Court's authority to sell office furniture because Debtors can no longer afford office space). Given the Debtors' impending inability to pay debts as they come due, the Court should convert this case to chapter 7 so that a trustee can liquidate Debtors' property and attempt to salvage what value remains for creditors.

B.  ***Debtors Failed to Comply with Reporting Requirements Under the Code and Rules.***

15. Cause also exists because Debtors have failed to fulfill basic obligations under the Bankruptcy Code, Bankruptcy Rules, and applicable regulations. Importantly, Debtors have not filed a single monthly operating report since filing for bankruptcy protection in July 2019. *See* FED. R. BANKR. P. 2015(a)(6); L. Rule 2015(b); Region 7 Guidelines for Debtors-in-Possession VII(A) ("Pursuant to FRBP 2015, the Debtor must file monthly operating reports with the Clerk of the Bankruptcy Court."). Had Debtors timely filed monthly operating reports, creditors would have known early on that Debtors' lacked the financial wherewithal to remain in chapter 11. Debtors also admittedly executed amendments to their so-called "Wind Farm Leases" without advising the Court or its creditors. *See Debtors' Motion to Assume and Amend Wind Farm Leases Entered Into With EDF Renewables Development, Inc.* at Dkt. No. 204 in Case No. 19-70106, p.

6

3 (seeking the Court's after-the-fact blessing on previously executed amendments); *see also* 11 U.S.C. § 363(b)(1) (debtors may use, sell, or lease estate property outside the normal course of business "after notice and a hearing"); Region 7 Guidelines for Debtors-in-Possession I(F) ("No assets may be sold or disposed of, other than in the ordinary course of business, except as allowed by and in compliance with 11 U.S.C. § 363 and the FRBP governing sales."). Management's failure to provide required operating reports or comply with the requirements of the Bankruptcy Code while taking large secured DIP loans from, *inter alia*, insider Gilmore Oil and Gas, LP (a 33% owner of Debtors), have left creditors and the Court guessing about what Debtors have been doing since filing for bankruptcy protection while simultaneously giving up previously unencumbered property to repay insider loans.

C. *Absence of Reasonable Likelihood for Rehabilitation.*

Management's Marketing Efforts Have Failed and Debtors' Plans are Unrealistic.

16. The evidence demonstrates that Debtors cannot rehabilitate through bankruptcy. *See Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business"). Debtors plan to (i) sell their Caprock Property, (ii) "identify a marketing group" to market their wind rights, and (iii) "retain [their] North Square Lake [Unit so Debtors can] … reduce our debt as much as possible on divestiture of the other assets, take whatever cash is left over and then— and then basically rework the wells on North Square Lake." Ex. 1 at pp. 241:8-243:3. Debtors' 2004 testimony, however, reveals it is unrealistic to expect that Debtors can sell their Caprock Property and wind rights for enough money to pay administrative expenses and sufficiently capitalize their North Square Lake Unit in a manner that would result in a confirmable plan of reorganization.

7

17. To date, Debtors' attempts to sell their Caprock Property have resulted in zero bids and come at a cost of $1,000,000 in post-petition financing. *See* Ex. 1 at p. 46:22-24 ("The outcome was no bids were submitted on the Caprock Asset."). Although Debtors stated they intend to file a "motion for approval of the sale of their Caprock Assets" no such motion has been filed, and Debtors' 2004 testimony casts significant doubt on whether any such sale could be viable. *Application for Entry of an Order Authorizing the Debtors to Employ and Retain Energy Advisors Group, Inc. as Marketing Agent to the Debtors Effective Nunc Pro Tunc to October 31, 2019* at Dkt. No. 216 in Case No. 19-70106, p. 3. Mr. Gray explained that the potential buyer, Circle Ridge Production, may or may not have the financial wherewithal to purchase Debtors' Caprock Property and admitted that Circle Ridge Production was aware of Debtors' prior marketing efforts but chose not to submit a bid because Circle Ridge Production was "unsophisticated in the realm of who to work through a bankruptcy process or a 363 Sale." Ex. 1 at pp. 154:10-152:25. Indeed, Debtors have not provided any assurances, *inter alia*, that Circle Ridge Production has representation, could satisfy necessary conditions to closing, or has the capacity to assume necessary executory contracts. Debtors' vague reference to a potential sale, therefore, seems more fantasy than reality, especially given that Debtors will have no operating capital come December.

18. Even if Debtors did sell all their property except for the North Square Lake Unit, they would not have sufficient funds to reorganize around that property. Mr. Gray explained that it would cost Debtors "$100,000,000 CAPEX" to "fully develop" the North Square Lake Unit. *Id*. at 263:22-23. Thus, even if Debtors sold their Caprock Property for $6,000,000, that amount would be insufficient to (i) pay Debtors' administrative expenses, (ii) pay Debtors' DIP debt, and (iii) develop the North Square Lake Unit (which currently generates approximately $20,000 in cash flow per month) in a manner to make any meaningful payment toward the more than

8

$20,000,000 in prepetition liabilities. *See, e.g.,* Remnant Oil Company Schedules at Dkt. No. 94 in Case No. 19-70106 at p. 1 ("Total Liabilities" equal $20,230,326.29).

Past Performance Demonstrates Inability to Reorganize.

19. Debtors admit that since formation, they have never been solvent or operated profitably. Mr. Gray testified that since Debtors were formed in 2016 the value of their assets never exceeded the amount of their liabilities. *See* Ex. 1 at p. 232:12-15 (consolidated financial statement showing that, at end of 2018, Debtors' assets were worth $1,058,000 and Debtors' liabilities totaled $17,274,000). Just as troubling, Mr. Gray explained that although Remnant Operating operates oil and gas leases owned by Remnant Oil Company, Remnant Operating never billed Remnant Oil Company for its services. *See id.* at p. 198:6-8. When asked how much Remnant Oil owes to Remnant Operating, Mr. Gray testified that he did not know because "[w]e just have never done it that way on accounting purposes" and "[w]e just basically transfer the money over, what's necessary from Remnant Oil Company to Remnant Oil Operating." *Id.* at p. 198:9-25. Not surprisingly, no operating agreements exist between the Debtors. *See id.* at p. 196:3-5. And even though each Debtor maintains separate books, management treats them like a single entity. *See id.* at p. 239:25-240:8 (explaining Debtors' principals would decide when to move money back and forth between Debtors' bank accounts). Accordingly, management's past performance provides little comfort that they can successfully guide Debtors through the chapter 11 process.

Debtors' Pleadings Evidence Their Lack of a Plan.

20. In their recently filed motion to extend their exclusivity period, Debtors argue that:

- "Debtors have focused their efforts on marketing certain of their assets to maximize value for their estates and their creditors while formulating a plan for their remaining assets;"

- "Debtors marketing efforts have included conducting meetings between the Debtors'

9

- current management and prospective buyers, providing access to the Debtors' information to facilitate due diligence review, and engaging in discussions with prospective buyers to facilitate review of their assets;" and

- "Debtors anticipate that their marketing efforts will result in the consummation of one or more sales."

*Debtors' Motion Pursuant to 11 U.S.C. § 1121(d)(1) for an Order Extending the Exclusive Periods in Which to Propose a Chapter 11 Plan and to Solicit Acceptances Thereof* at Dkt. No. 202 in Case No. 19-70106. The lack of detail is not surprising since, to date, management's efforts have resulted in nothing more than $1,000,000 in secured DIP loans and increasing administrative expenses. As explained above, Debtors' bankruptcy plans are, at best, unrealistic. Management's pre and post-bankruptcy performance demonstrates that Debtors' creditors would be far better off if the Court replaced current management with an independent chapter 7 trustee.

### D. Irreconcilable Conflicts Exist.

21. Management's inability to make progress likely stems from its unworkable desire to sell Debtors' less valuable assets and retain Debtors' more valuable North Square Lake Unit so Debtors can (i) pay insider equity contributions as debt and (ii) ignore obvious avoidance actions to recover significant amounts paid to insiders during the one-year prior to bankruptcy. At Debtors' 2004 examination, Mr. Gray maintained that Debtors owe more than $8 million in promissory note debt to insiders as follows:[3]

- WS Oil and Gas Limited ("WS"): $353,449.08;

- RS Resources Limited ("RS"): $444,457.81; and

- Gilmore Oil & Gas, LP ("Gilmore"): $7,221,015.00.

---

[3] These three limited partnerships are Debtors' equity owners, with each owning a 33% interest. *See* Ex. 1 at 199:6-13. WS Oil and Gas Limited's partners are (i) First Gray Corporation (GP) and (ii) Will and Sarah Gray (LPs). *See id.* at 200:23-201:13. RS Resources Limited's partners are, upon information and belief, (i) Steitzel Corp. (GP) and (ii) Robert Steitzel (LP). Gilmore Oil and Gas, LP's partners are, upon information and belief, (i) Bluebird Energy Corp. (GP) and (ii) Reed Gilmore (LP).

10

*See* Dkt. 94 in Case No. 19-70106 at pp. 55-56, 127, & 156. These amounts originated from cash contributions that that WS, RS, and Gilmore made to Debtors. *See* Ex. 1 at pp. 35:6-36:22 (explaining that (i) WS contributed "just under a million dollars," (ii) Gilmore contributed "approximately $7,000,000 in cash since formation," and (iii) RS contributed about $460,000). With respect to the alleged loan from Gilmore, Mr. Gray explained as follows:

> Q: Are there any other loan[] agreements between Oil Company and any of its owners?
>
> A: Yes, there are.
>
> Q: Okay. What are those?
>
> A: Those are subsequent loans that have been made … since the formation and approximately 7,000,000 of [it] is to --- is documented with Gilmore Oil and Gas.
>
> Q: How is that document[ed]?
>
> A: In a promissory note.
>
> Q: What's the date of that promissory note?
>
> A: Sometime—I want to say in '19—we—we just haven't formalized everything.
>
> Q: When in '19?
>
> A: I can't state specifically.
>
> Q: Pre or post-bankruptcy?
>
> A: Pre.
>
> Q: Approximately how long before bankruptcy?
>
> A: I can't state with 100 percent accuracy. It was pre—it was pre-filing.

*Id.* at 191:15-192:8. With respect to the loan allegedly owed to his partnership WS, Mr. Gray testified that:

11

> Q: Are there any other loans Remnant Oil Company owes to its owners that we haven't yet discussed?
>
> A: I put in---WS Oil and Gas put in an additional approximately half a million dollars, 525 during—during [] time as well.
>
> Q: During what time?
>
> A: During the time period between 2016 and 2018.
>
> Q: Okay. Is—is there a loan agreement, or a promissory note—
>
> A: Yes, sir, a promissory note.
>
> Q: --related to that?
>
> A: Yes, sir.
>
> Q: Okay. And when was that promissory note ….
>
> A: Around the same time when Mr.—Mr. –when Oil and Gas's was drafted to—just to finalize.

*Id.* at 194:1-16. Indeed, Mr. Gray believes management can credit bid this alleged insider debt at a sale of Debtors' assets. *See id.* at 181:8-184:3.

22. Further, in the one year prior to Debtors' petition dates, WS and RS paid themselves not less than $720,539, for what Mr. Gray termed "consulting fees." *See* Remnant Oil Operating Statements of Financial Affairs (filed on Donlin Recano website) at pp. 50-52 (identifying transfers totaling $165,000 to RS) & 53-58 (identifying transfers totaling $465,732 to WS); *see also* Dkt. No. 98 in Case No. 19-70106 at pp. 8-9 (identifying transfers totaling $86,807 to WS). Neither Debtor, however, had a consulting agreement with WS or RS. *See* Ex. 1 at pp. 214:15-18 & 240:9-13. Mr. Gray even testified that Debtors paid WS past due "consulting fees" shortly before bankruptcy because "[w]e felt that—that that would be appropriate to—to get me caught up—help me in getting caught up some" despite the fact that Debtors have *always* been insolvent. *Id.* at 240:24-241:2. Instead of pursing an unrealistic plan of reorganization that can only result in

more burden on Debtors' creditors, the Court should convert these cases so that an independent chapter 7 trustee can liquidate Debtors' assets, subordinate the significant insider debt, and attempt to recover avoidable transfers made to Debtors' insiders.

## V.
## CONCLUSION

23. The Court should convert these bankruptcy cases to cases under chapter 7 of the Bankruptcy Code before matters further deteriorate. As explained above, Debtors (i) have never been solvent, (ii) lack a viable plan to reorganize, (iii) presided over a wholly unsuccessful marketing effort, (iv) continued to lose money while increasing the debt load, and (v) ignored basic obligations under the Bankruptcy Code. Management's desire to forge ahead with an unrealistic plan so Debtors can repay insider equity contributions and forestall inevitable insider avoidance actions may explain the current morass. Whatever the reason, current management's operations have only harmed Debtors' creditors and there is no end in sight. The Court, therefore, should convert Debtors' cases and appoint a competent, independent chapter 7 trustee to liquidate Debtors' assets for the benefit of their creditors.

## NOTICE

Notice of this Motion will be provided to: (a) counsel to the Debtors; (b) the Office of the United States Trustee for the Western District of Texas; (c) counsel to the Debtors' secured creditors; and (d) the parties listed on the Debtors' Master Service List. Movants submit that, in light of the nature of the relief requested, no other or further notice need be given.

## RESERVATION OF RIGHTS

Movants expressly reserve the right to withdraw this Motion, should the Debtors provide sufficient evidence to Movants that a sale of all or substantially all of Debtors' assets is imminent, materially significant, and capable of being consummated in a timely fashion. Further, Movants

expressly reserve the right to pursue conversion or dismissal on alternative grounds for "cause" enumerated in 11 U.S.C. § 1112(b)(4)(A)-(P).

Respectfully submitted on the 27th day of November 2019.

**OKIN ADAMS LLP**

By:    /s/ *John Thomas Oldham*
      Matthew S. Okin
      Texas Bar No. 00784695
      Email: mokin@okinadams.com
      Christopher Adams
      Texas Bar No. 24009857
      Email: cadams@okinadams.com
      John Thomas Oldham
      State Bar No. 24075429
      Email: joldham@okinadams.com
      1113 Vine St. Suite 240
      Houston, Texas 77002
      Tel: (713) 228-4100
      Fax: (888) 865-2118
**COUNSEL FOR KODIAK GAS SERVICES, LLC**


By: */s/ Blake Hamm*
      Phil F. Snow, TX State Bar #18812600
      Blake Hamm, TX State Bar #24069869
      **SNOW SPENCE GREEN LLP**
      2929 Allen Parkway, Suite 2800
      Houston, TX 77019
      Telephone (713) 335-4868
      Facsimile (713) 335-4848
      Email: philsnow@snowspencelaw.com
             blakehamm@snowspencelaw.com
**COUNSEL FOR BAKER HUGHES OILFIELD OPERATIONS LLC AND BAKER PETROLITE LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing pleading was served upon filing via the Court's CM/ECF system upon those parties subscribing thereto.

      */s/ John Thomas Oldham*
      John Thomas Oldham