**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Remnant Oil Company, LLC and | § | Case No. 19-70106 |
| Remnant Oil Operating, LLC, | § | Case No. 19-70107 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |
| | § | (Jointly Administrated under |
| | § | Case No. 19-70106) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE PRIVATE SALE OF DEBTORS' CAPROCK**
**ASSETS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE;**
**(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE**
**RELATED LEASES AND CONTRACTS PURSUANT TO SECTION 365**
**OF THE BANKRUPTCY CODE; AND (III) GRANTING RELATED RELIEF**

> **This pleading requests relief that may be adverse to your interests.**
>
> **If no timely response is filed within 21 days from the date of service, the relief requested herein may be granted without a hearing being held.**
>
> **A timely filed response is necessary for a hearing to be held.**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

COME NOW Remnant Oil Company, LLC ("**Remnant Company**") and Remnant Oil Operating, LLC ("**Remnant Operating**" and together with Remnant Company, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and file this *Debtors' Motion for Entry of an Order (I) Authorizing the Private Sale of Debtors' Caprock Assets Pursuant to Section 363 of the Bankruptcy Code; (II) Authorizing the Assumption and Assignment of the Related Leases and Contracts Pursuant to Section 365 of the Bankruptcy Code; and (III) Granting Related Relief* (the "**Motion**"), and would respectfully show the Court as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The relief sought in this motion is based upon sections 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

**A.      The Debtors' Bankruptcy Cases.**

1.      On July 16, 2019 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.  An official committee of unsecured creditors (the "**Committee**") was appointed on August 7, 2019 [Docket No. 67] and amended on September 20, 2019 [Docket No. 153].

4.      The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in more detail in the *Declaration of E. Willard Gray II in Support of Chapter 11 Petitions and First Day Motions* (the "**Gray Declaration**") [Docket No. 9], which is incorporated herein by reference.

**B.      The Proposed Sale.**

5.      Prior to the Petition Date and in the post-Petition Date period, the Debtors actively marketed their assets and sought out opportunities to restructure their debts.  On August 29, 2019, the Debtors filed the *Motion of the Debtors for Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Selection of a Stalking Horse Bidder, (C) Approving Bid Protections, (D) Scheduling an Auction and Hearing to Consider Such Sale of Assets, (E) Approving Assumption and Assignment Procedures Related to Such Sale, and (F) Approving the Form and Manner of Related Notice; and (II)(A) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases In Connection With Such Sale, and (C) Granting Related Relief* (the "**Public Sale Motion**") [Docket No. 95].  The Court entered an order approving sale procedures and deadlines relating to the Public Sale Motion on September 10, 2019 [Docket No. 133] (the "**Sale Procedures Order**"), which sale deadlines were later extended by order of the Court entered on October 11, 2019 [Docket No. 172].

6.      On September 23, 2019, the Debtors filed the *Application for Entry of an Order Authorizing the Debtors to (I) Employ and Retain Seaport Global Securities, LLC as Investment Banker to the Debtors Effective Nunc Pro Tunc to September 16, 2019, (II) Approving the Terms of the Engagement Letter, (III) Waiving Certain Time-Keeping Requirements and (IV) Granting Related Relief* [Docket No. 158], seeking to retain Seaport Global Securities, LLC ("**Seaport**") to assist in marketing the Debtors' assets for sale.  The Court approved Seaport's retention by order entered on October 22, 2019 [Docket No. 186].

7.      In connection with the Debtors' prepetition marketing efforts and the Public Sale Motion, the Debtors have spoken with and/or met with numerous prospective purchasers for the Assets (defined below).  In addition, Seaport contacted hundreds of different entities regarding a potential purchase of the Assets.

8.      Through the Debtors' sale efforts, the Debtors were approached by Circle Ridge Production, Inc. (the "**Purchaser**"), which has made an offer to purchase the Debtors' right, title, and interest in and to the Debtors' assets located in the Caprock region of Chaves and Lea Counties, New Mexico (the "**Assets**"), which Assets are set forth more fully in the Exhibits to the Purchase and Sale Agreement (the "**PSA**").  In general, the Assets cover approximately 13,980 gross acres and contain 174 wells, consisting primarily of the 96-well Rock Queen Unit, the 49-well Drickey Queen Sand Unit, and 29 other wells in the West Caprock Queen Unit, the North Caprock Celero Unit, and other miscellaneous Caprock-areas, the Debtors' eighteen mile $CO_2$ pipeline, and the Debtors' right to produce 16,000 bbls daily of fresh water, via two water licenses, L-3776 and L-2661, issued by the New Mexico Office of the State Engineer.  The proposed purchase price for the Assets under the PSA is $6,000,000, subject to certain adjustments set forth in the PSA (the "**Purchase Price**").

9.      While other prospective purchasers conducted diligence on the Assets, no other offers were received for the Assets.  Accordingly, after considering all options, the Debtors negotiated and prepared the PSA for the private sale (the "**Sale**") of the Assets to the Purchaser, as the prospective Purchaser of the Assets.  A copy of the PSA, as executed by the Debtors and the Purchaser, and which is subject to the approval of the Court, is attached hereto as **Exhibit A**, and is fully incorporated herein by reference.  The full terms and conditions of the proposed

transaction are set forth in full in the PSA and reference should be made thereto for all of its terms.

10.     The Debtors have determined to proceed with the Sale as a private sale because, given their extensive marketing efforts to date, they do not believe that another stalking horse process will result in a higher price.  The Debtors further understand that the Purchaser will not participate in a stalking horse sale process.  Instead, the Purchaser has made a good faith offer of the Purchase Price in reliance on the Debtors' determination to move forward with the Sale as a private sale.  The Debtors submit that the Purchase Price is fair and reasonable compensation for the Assets.

**C.      Assumption and Assignment of Contracts and Leases.**

11.     On February 11, 2020, Debtors filed *Debtors' Conditional Motion Regarding Assumption of Oil and Gas Leases as Executory Contracts or Unexpired Leases as of February 11, 2020* [Docket No. 292] (the "**Lease Assumption Motion**").  By the Lease Assumption Motion, the Debtors have sought to assume each of their oil and gas leases, to the extent they are determined to be unexpired leases within the meaning of section 365 of the Bankruptcy Code, and have requested that the cure amount for such assumption should be set at $0.00.  By this Motion, and pursuant to the procedures set forth herein, the Debtors seek the ability to assume and assign certain of the oil and gas leases that are the subject of the Lease Assumption Motion to the Purchaser.

12.     Specifically, the PSA contemplates the assignment to the Purchaser of certain of the oil and gas leases that are the subject of the Lease Assumption Motion, which are located in the Caprock area of New Mexico (the "**Leases**") as well as the assumption and assignment of contracts and agreements ancillary thereto (the "**Contracts**").  While, just as in the Lease

Assumption Motion, the Debtors do not concede that all of the Contracts are executory contracts subject to the assumption and assignment procedures of section 365 of the Bankruptcy Code, the Debtors nonetheless will seek the Court's approval of the assumption and assignment of the Leases and Contracts out of an abundance of caution.  The Leases and Contracts that the Debtors currently intend to assume and assign to the Purchaser are set forth on Exhibit A – Sections I-IV to the PSA.

13.    The cure amounts, if any, as determined by the Court, necessary to allow assumption and assignment of the Leases and Contracts (the "**Cure Amounts**") shall be paid by the Purchaser at or before the closing of the Sale (except as otherwise agreed to by the other parties to the Leases and Contracts) and, except as set forth in the PSA, the Debtors shall have no liability for any such Cure Amounts.

14.    **Upon a review of their books and records, the Debtors have determined that the Cure Amounts for the Leases and Contracts is $0, and request a determination and finding by this Court of such zero Cure Amounts.  The Debtors propose that the deadline for the counter-parties to the Leases and Contracts to object to the Debtors' proposed Cure Amounts as listed herein should be that date which is 21 days after the filing of this Motion (the same date for filing any objections to this Motion).  Parties receiving this Motion should review Exhibit A – Sections I-IV for their Contract or Lease.  Any objection to the Cure Amounts which is timely filed and served by the counter-parties to the Leases and Contracts, and which is not otherwise resolved by the parties, shall be heard by the Court at the hearing on this Motion.**

15.    Pursuant to the PSA, the Purchaser shall be responsible for satisfying the Cure Amounts as described above or otherwise set by final order of the Court.  *See* PSA § 1.2.  The

Purchaser shall further be responsible for providing adequate assurance of future performance pursuant to section 365(b) of the Bankruptcy Code in connection with the proposed assumption and assignment of the Leases and Contracts, to the extent those Leases and Contracts are found to be executory contracts subject to the requirements of section 365 of the Bankruptcy Code.

16.     To the extent the Purchaser identifies additional Leases and Contracts for assumption and assignment as contemplated by section 2.3 of the PSA, the Debtors will provide notice to such counterparties by separate motion.

**RELIEF REQUESTED**

17.     By this Motion, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit B**, (i) approving the Sale of the Assets to the Purchaser, in accordance with the terms set forth in the PSA, free and clear of all liens, claims, encumbrances, and other interests, and including a finding of the Purchaser's good faith pursuant to sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (ii) authorizing the assumption and assignment of the Leases and Contracts pursuant to sections 363 and 365 of the Bankruptcy Code, to the extent the Leases and Contracts are found to be executory contracts subject to the provisions of section 365 of the Bankruptcy Code and setting the Cure Amounts; and (iv) granting related relief as the Court shall deem just and proper.

**BASIS FOR RELIEF REQUESTED**

**I.      THE PROPOSED SALE OF THE ASSETS IS AUTHORIZED BY SECTION 363 OF THE BANKRUPTCY CODE.**

18.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  As set forth herein, the Sale is authorized by section 363(b)(1) of the Bankruptcy Code because the Debtors have exercised sound business judgment in pursuing and

proposing the Sale, and the Sale was negotiated with the Purchaser at arms-length and in good faith.  Moreover, under the circumstances, a private sale is warranted and justified.  Finally, the Sale satisfies the requirements of section 363(f) of the Bankruptcy Code for a sale free and clear of liens, claims, interests, and encumbrances.

**A.**       **The Proposed Sale Is Within the Debtors' Sound Business Judgment.**

19.       A proposed sale of the assets of a debtor outside the ordinary course of business is appropriate if the court finds that a sound business justification exists for doing so.  *See In re Sonrisa Realty Partners, Ltd*., No. 10-80026-G3-11, 2011 Bankr. LEXIS 1733, at *6-7 (Bankr. S.D. Tex. May 6, 2011) ("Under Section 363(b) of the Bankruptcy Code, a sale requires that the proponent articulate a sound business justification for the proposed transaction." (citing *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986)).  *See also In re Quality Beverage Co.*, 181 B.R. 887, 895 (Bankr. S.D. Tex. 1995); *In re Property Co. of Am. Joint Venture*, 110 B.R. 244, 247 (Bankr. N.D. Tex. 1990).

20.       "In determining whether a proposed sale satisfies the 'business judgment' standard, courts typically consider whether: a) sound business justification exists for the sale; b) fair and reasonable consideration is provided; c) the transaction has been proposed in good faith; and d) adequate and reasonable notice is provided."  *In re N. Am. Techs. Group, Inc.*, No. 10-20071, 2010 Bankr. LEXIS 5834, at *7 (Bankr. E.D. Tex. Aug. 16, 2010) (citing *In re Condere Corp.*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998)).  Application of each of these factors to the Sale illustrates the Debtors' exercise of sound business judgment.

**i.**       **Sound Business Reasons Exist for the Proposed Sale.**

21.       Sound business reasons exist to justify the private sale of the Assets.  The Debtors actively sought buyers for their assets prior to the Petition Date, and have continued to

seek buyers for their assets in the post-Petition Date period. *See* Public Sale Motion and Seaport Retention Application. As a result of these efforts, and after speaking to and/or meeting with numerous prospective purchasers, the Debtors found the Purchaser for the Assets. Accordingly, it is not likely that additional marketing or an auction process with respect to the Assets would result in greater value to the estate. Furthermore, it is unlikely that the costs to the Debtors' estates of additional marketing would result in any higher offers for the Assets.

22.     The Debtors have determined that it is necessary to move forward with the Sale at this point in these Chapter 11 Cases, rather than conducting the Sale through a plan, because closing the sale as soon as possible will result in a decrease in the Debtors' operating expenses and will redound to the benefit of creditors. However, since the Sale is not of substantially all of the Debtors' assets, and is limited only to the Assets located in the Caprock region of New Mexico, the Debtors submit that the Sale is not a *sub rosa* plan and should proceed. *See In re Continental Air Lines, Inc.*, 780 F.2d at 1226 (prohibiting the sale of substantially all of a debtor's assets without affording creditors the protections they would otherwise be entitled to under a plan).

23.     The proposed transaction represents the highest and best use for the Assets. Under these circumstances, sound business reasons exist that justify the sale of the Assets outside the ordinary course of business by private sale.

**ii.      The Proposed Consideration Offered is Fair and Reasonable.**

24.      The Debtors engaged in extensive negotiations with the Purchaser, and have sought to maximize the value that will be realized from the sale of the Assets. The Debtors have determined to proceed with the Sale as a private sale because, given their extensive marketing

efforts to date, they do not believe that a stalking horse process will result in a higher price. Debtors submit that the Purchase Price is fair and reasonable compensation for the Assets.

### iii. The Sale Process Has Been Undertaken in Good Faith.

25.     In relevant part, section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under [section 363(b)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ."  Section 363(m) of the Bankruptcy Code "codifies Congress's strong preference for finality and efficiency in the bankruptcy context, particularly where third parties are involved.  By providing good faith purchasers with a final order and removing the risks of endless litigation over ownership, [s]ection 363(m) allows bidders to offer fair value for estate property, which greatly benefits both the debtor and its creditors."  *Petfinders, L.L.C. v. Sherman (In re Ondova Ltd. Co.)*, No. 13-10120, 2015 U.S. App. LEXIS 14381, at *5-6 (5th Cir. Aug. 14, 2015) (citing *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 218-219 (5th Cir. 2013) (internal citations and quotations omitted)).

26.     "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Condere Corp.*, 228 B.R. 615, 631 (Bankr. S.D. Miss. 1998) (quoting *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981)).

27.     The Debtors attest that neither the Purchaser of the Assets nor any of its affiliates are "insiders" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code and

are not controlled by, or acting on behalf of, any insider of the Debtors.  The Debtors have no reason to believe that the Purchaser participated in fraud, collusion or any other efforts to take unfair advantage of the Debtors.

28.     Furthermore, the Debtors submit that the Sale to the Purchaser is the result of a negotiated, arm's-length transaction, in which Purchaser at all times acted in good faith.  Thus, the Debtors request that the Court find that the Purchaser will be purchasing the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**iv.     Adequate and Reasonable Notice Will Be Provided.**

29.      The Debtors propose to serve this Motion by first-class mail, postage prepaid or by electronic transmission upon:  (i) the Office of the United States Trustee for the Western District of Texas; (ii) the Committee; (iii) the Internal Revenue Service and all state and local taxing authorities or recording offices that have a reasonably known interest in the relief requested; (iv) all non-debtor parties to the Leases and Contracts; (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim or other interest in the Assets; (vi) all parties that have previously expressed interest in a potential purchase of the Assets; and (vii) upon all parties set forth in the Debtors' Master Service List maintained in these cases (to the extent any party to receive notice thereby has not received notice pursuant to sections (i) through (vi) above).  The Debtors submit that such notice constitutes adequate and reasonable notice to interested parties under the circumstances.

30.     Accordingly, because a sound business justification exists for the Sale, fair and reasonable consideration has been negotiated, the Sale has been proposed in good faith, and adequate and reasonable notice will be provided, the Debtors submit that the Sale is authorized under section 363(b)(1) of the Bankruptcy Code.

**B.     A Private Sale of the Assets is Appropriate Under Bankruptcy Rule 6004.**

31.     The Sale by private sale is warranted under the circumstances.  Bankruptcy Rule 6004(f) permits a debtor to conduct a private sale pursuant to section 363, providing that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1); *see also In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (stating the debtor has authority to conduct public or private sales of estate property); *In re Alisa P'ship*, 15 B.R. 802 (Bankr. D. Del. 1981) (holding that manner of sale is within the debtor's discretion).

32.     Therefore, in light of Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists. *See, e.g.*, *In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Condere*, 228 B.R. at 629 (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale."); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

33.     Indeed, courts have approved private sales of estate property pursuant to section 363(b)(1) when there has been a valid business reason for not conducting an auction. *See, e.g.*, *In re Pilgrim's Pride Corp.*, No. 08-45664 (DML) (Bankr. N.D. Tex. Dec. 16, 2009) (approving the private sale of intellectual property for $30,000); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately

$3.8 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr. S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).

34.     As a result of negotiations with the Purchaser, the Debtors have determined that the sale of the Assets as requested herein provides the best and most efficient means for the Debtors to maximize the value of the estates, and avoid further deterioration in value. The Debtors have considered the Sale, as a private sale, after thorough consideration of all viable alternatives, and have concluded that the Sale is the best avenue for maximizing value to the estates, which is the paramount goal in any proposed sale of property of the estate. *See In re Dura Automotive Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate" (internal citations omitted)).

35.     The Sale described in this Motion will allow the Debtors to maximize the value of the Assets and provide a significant benefit to the Debtors' estates. Because private sales are specifically authorized under Bankruptcy Rule 6004 and the Debtors believe that the Purchaser's offer represents the highest and best offer for the Assets, the Debtors request that the Court approve the proposed private Sale on the terms described herein.

### C.     The Sale of the Assets Should be Granted Free and Clear of Liens, Claims, Interests and Encumbrances.

36.     The Sale free and clear of all liens, claims, interests and encumbrances will maximize value to the estates.  Section 363(f) of the Bankruptcy Code permits a debtor to sell estate property free and clear of another party's interest in the property where:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

> (2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. 363(f).

37.     Because section 363(f) is drafted in the disjunctive, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all interests.  *See, e.g.*, *In re Sonoran Energy, Inc.*, No. 09-33852, 2009 Bankr. LEXIS 5430, at *7 (Bankr. N.D. Tex. Sept. 14, 2009) ("The debtor may sell the Assets free and clear of all liens, claims, interests and encumbrances of any kind whatsoever . . . because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.").

38.     A sale free and clear of all interests is necessary to maximize the value of the Assets.  A sale subject to claims and interests would result in a lower purchase price and be of substantially less benefit to the Debtors' estates.  The Debtors submit that any interests satisfy at least one of the conditions in section 363(f) of the Bankruptcy Code.  Accordingly, the Debtors request authority to convey the Assets to the Purchaser, free and clear of all interests.

## II.     THE ASSUMPTION AND ASSIGNMENT OF THE CONTRACTS AND LEASES IS AUTHORIZED BY SECTION 365 OF THE BANKRUPTCY CODE.

39.     The Debtors request approval of the ability to assume, assign and sell the Contracts and Leases to the Purchaser as part of the Assets sold pursuant to the PSA.  Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. 11 U.S.C. § 365(f)(2).

11 U.S.C. § 365(f)(2).

40.    Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

41.    Section 365 of the Bankruptcy Code allows a debtor in possession to maximize the value of a debtor's estate by assuming and assigning executory contracts or unexpired leases that benefit the estate and rejecting those that do not. *See Lifemark Hosp., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410, 438 (5th Cir. 2002); *Ins. Co. of N. Am. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 505 (5th Cir. 2000); *In re*

*Taylor*, 913 F.2d 102 (3d Cir. 1990); *In re Gardinier, Inc.*, 831 F.2d 974, 975 n.2 (11th Cir. 1987).

42.     The decision to assume or reject an executory agreement is a matter within the "business judgment" of the debtor. *See NLRB v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513 (1984). *See also In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003). Under such circumstances, the business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del 2001); *see also Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstance, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

43.     The assumption and assignment of the Contracts and Leases, to the extent those agreements are found to be executory contracts subject to assumption and assignment, is a vital part of the Sale.  As stated above, such disposition provides the maximum available to benefit the Debtors' estates.  To the extent no objection is filed with regard to the Cure Amounts, such Cure Amounts shall be binding on the counter-parties to the Contracts and Leases, as well as all other parties in interest.  The payment of the Cure Amounts will be in full and final satisfaction of all obligations to cure defaults and compensate the non-Debtor parties to the Contracts and Leases for any losses under the Contracts and Leases pursuant to section 365(b)(1) of the Bankruptcy Code.  As set forth herein, the Debtors believe, upon a review of their books and records that the Cure Amount for the Contracts and Leases is $0.  However, to the extent the Cure Amounts are properly disputed by the contracting parties to the Contracts and Leases, such dispute will be resolved by the Court at the hearing on the Motion.

44.     As set forth in this Motion, the Purchaser is responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of the Contracts and Leases. The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the proposed assumption. *Richmond Leasing Co v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *see also Texas Health Enters., Inc. v. Lytle Nursing Home (In re Texas Health Enters., Inc.)*, No. 02-40734, 72 Fed. Appx. 122, 126 (5th Cir. 2003) (unpublished); *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-606 (Bankr. S.D.N.Y. 1986) (holding adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding); *see also In re Old S. Coors, Inc.*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (considering the long and successful business experience and financial strength of each proposed assignee in holding that adequate assurance of future performance by proposed assignee was met).

45.     The Debtors believe that the Purchaser has the financial wherewithal to satisfy any and all obligations under the Contracts and Leases.  The Debtors and Purchaser are prepared to present evidence of this at a hearing on this Motion, consistent with the requirements of the PSA.  Accordingly, the Debtors respectfully request that the Court approve the assumption by the Debtors of the Contracts and Leases and the assignment thereof to the Purchaser in accordance with the PSA.

### OBJECTIONS

46.     All objections to the Sale of the Assets, the assumption and assignment of the Contracts and Leases, or any relief requested in this Motion must be:  (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules of the Court; (d) filed with the Bankruptcy Court no later than 5:00 p.m. (Central Time) on March 12, 2020 (the "**Objection Deadline**"); and (e) served in accordance with the Local Rules so as to be received on or before the deadline by the following: (i) counsel for the Debtors, Loeb & Loeb LLP, 10100 Santa Monica Blvd., Suite 2200, Los Angeles, CA 90067, Attn:  Bernard R. Given II, (ii) counsel to the Purchaser, Jess N. Turner III, Turner & Allen, P.C., P.O. Box 930, Graham, TX 76450, (iii) counsel to the Committee, Brinkman Portillo Ronk, P.C., 4333 Terrace Drive, Suite 205, Westlake Village, CA 91361, Attn: Daren R. Brinkman, and (iv) Office of the United States Trustee for the Western District of Texas, 615 East Houston Street, Suite 533, San Antonio, TX 78205, Attn:  Jim Rose.

WHEREFORE, the Debtors respectfully request that the Court:  (i) grant this Motion; (ii) enter the proposed Order attached hereto as **Exhibit B**; and (iii) grant the Debtors such other and further relief as this Court deems appropriate.

Dated: February 20, 2020
       Los Angeles, California

**LOEB & LOEB LLP**

*/s/ Bernard R. Given II*
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067-4120
Telephone: 310-282-2000
Facsimile: 310-282-2200
Email:  bgiven@loeb.com

-and-

Daniel B. Besikof (admitted *pro hac vice*)
Bethany D. Simmons (admitted *pro hac vice*)

345 Park Avenue
New York, New York 10154
Telephone: 212-407-4000
Facsimile: 212-407-4990
Email:  dbesikof@loeb.com
            bsimmons@loeb.com

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2020, a true and correct copy of the above and foregoing Motion was caused to be served electronically on the parties registered to receive notice through the court's ECF noticing system.  I hereby further certify that within twenty four hours of the filing of the foregoing Motion, a true and correct copy of the same was caused to be served by Donlin Recano & Co., the Debtors' noticing agent, via first class U.S. mail, postage prepaid, upon all parties in interest in these cases and on Circle Ridge Production, Inc.

By:  */s/* Bernard R. Given
Bernard R. Given II

# Exhibit A

EXECUTION VERSION

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement"), entered into on February 20, 2020 is by and between Remnant Oil Company, LLC and Remnant Oil Operating, LLC (together, the "Sellers"), and Circle Ridge Production Inc. ("Buyer"). Sellers and Buyer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Sellers own the Acquired Assets (as defined below) and desire to sell the Acquired Assets to Buyer, and Buyer desires to purchase the Acquired Assets from Sellers, upon the terms and conditions set forth herein.

WHEREAS, Sellers are debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and filed petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on July 16, 2019 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Texas (the "Court"), where the Sellers' bankruptcy cases are jointly administered under Case No. 19-70106 (the "Bankruptcy Case"); and

NOW THEREFORE in consideration of the mutual covenants contained in this Agreement and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

## ARTICLE I
## PURCHASE AND SALE

*1.1 Purchase and Sale*

(a)     Subject to the terms and conditions of this Agreement, Buyer agrees to purchase from Sellers, and Sellers agree to sell, assign and deliver to Buyer the Acquired Assets for the consideration specified in this *Article I*.

(b)     Sellers shall reserve and retain all of the Excluded Assets and Excluded Liabilities.

*1.2 Purchase Price*

Buyer agrees to pay to Sellers on the Effective Date: (a) Six Million Dollars ($6,000,000.00) in cash (the "Cash Price"), plus (b) the payment of Cure Costs, not to exceed an amount acceptable to Buyer, relating to the Desired Contracts on terms negotiated by Buyer and the contract counterparties and approved by the Court, plus (c) the assumption of certain Desired Contracts on terms negotiated by Buyer and the contract counterparties and approved by the Court, (collectively, the "Purchase Price").

*1.3 Deposit*

(a)     Concurrently with the closing of the sale of Panther Canyon Ranch between the Bill and Gayle Briscoe Family Trust and Doug Friedel, and AMG Salt Fork, LLC, described

in Section 6.1(uu), Buyer shall deliver to Turner & Allen, P.C. a performance guarantee deposit in an amount equal to $100,000.00 (the "Deposit").  The Deposit shall be made by Buyer to Turner & Allen, P.C. Trust Account by means of a completed wire transfer.

(b)  If Closing occurs, then the Deposit shall be paid to Sellers and credited against the Cash Price.

(c)  If this Agreement is terminated without Closing having occurred, then Turner & Allen, P.C. shall pay the Deposit to either Buyer or Sellers in accordance with the terms of Section 7.4 hereof.

### 1.4  Transfer Taxes.

Sellers shall be responsible for all sales, use and transfer or similar taxes arising from or relating to the consummation of the transactions contemplated by this Agreement and which, with respect to the Acquired Assets, are not eliminated through the application of section 1146(a) of the Bankruptcy Code (collectively, "Transfer Taxes"), regardless of the party on whom liability is imposed under the provisions of the laws relating to such Transfer Taxes.  Sellers and Buyer will consult and cooperate in timely preparing and making all filings, tax returns, reports and forms as may be required to comply with the provisions of the laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes. Buyer shall be responsible for all filing and recording fees and expenses arising from or relating to the consummation of the transactions contemplated by this Agreement.

### 1.5  Certain Periodic Non-Income Taxes.

(a) Except as expressly set forth in herein, Sellers shall be allocated and bear all ad valorem, sales or use, property, excise, severance, production or similar taxes (including any interest, fine, penalty or additions to tax imposed by a governmental authority in connection with such taxes) based upon the acquisition, operation, ownership, production or sale of the Acquired Assets or Hydrocarbons produced therefrom, and, any income, capital gains, franchise or similar taxes and any Transfer Taxes incurred or imposed with respect to the transactions described in this Agreement (collectively, the "Asset Taxes") attributable to any tax period (or portion thereof) ending prior to the Effective Date; and Buyer shall be allocated and bear all Asset Taxes attributable to any tax period (or portion thereof) beginning at or after the Effective Date.

(b) For purposes of determining the allocations described in Section 1.5(a), (i) severance taxes for any production month, prior to the Effective Date, shall be borne by Sellers, and severance taxes for any production month, after the Effective Date, shall be borne by Buyer; (ii) Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis shall be allocated to the period in which the activity or transaction giving rise to such Asset Taxes occurred; and (iii) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a tax period that begins before and ends after the Effective Date

18735549.2
233559-10002

shall be allocated between the portion of such period ending immediately prior to the Effective Date and the portion of such period beginning at the Effective Date by prorating each such Asset Tax based on the number of days in the applicable period that occur before the Effective Date, on the one hand, and the number of days in such period that occur on or after the Effective Date. Provided, however, that with respect to ad valorem taxes which are assessed in any year which are measured by the preceding year's production and sales of Hydrocarbons and are payable in the year following the year of assessment ("Oil and Gas Ad Valorem Taxes"), such taxes shall be allocated to the Party that owned the Acquired Assets during the taxable period or portion thereof for which the Oil and Gas Ad Valorem Tax is assessed.

(c) Buyer and Sellers will cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes.

### 1.6 Payment of Leasehold Obligations.

Buyer shall pay all royalties, overriding royalties, and other amounts payable on account of production of Hydrocarbons occurring after 7:00 a.m. on the Effective Date. Sellers shall pay all royalties, overriding roylaites, and other amounts payable on account of production of Hydocarbons occurring before 7:00 a.m. on the Effective Date. Buyer shall pay all shut-in royalties, lease rentals, and other leasehold liabilities payable for periods after 7:00 a.m. on the Effective Date. Sellers shall pay prior to or at closing all shut-in royalties, lease rentals, and other leasehold liabilities payable for periods before 7:00 a.m. on the Effective Date.

### 1.7 Purchase Price Allocation.

Sellers and Buyer have agreed to allocate the Purchase Price between the Oil and Gas Leases in accordance with the amounts listed in Exhibit B for U.S. federal income tax purposes in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and, to the extent allowed by applicable Laws (the "Allocation"). If Sellers and Buyer reach an agreement with respect to the Allocation, (i) Buyer and Sellers shall use commercially reasonable efforts to update the Allocation in accordance with Section 1060 of the Code, and (ii) Buyer and Sellers shall report consistently with the Allocation, as adjusted, on all Tax Returns, including Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060), which Buyer and Sellers shall timely file with the Internal Revenue Service, and neither Sellers nor Buyer shall take any position on any Tax Return that is inconsistent with the Allocation, as adjusted, unless otherwise required by applicable Law; provided, however, that neither Party shall be

18735549.2
233559-10002

unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar proceedings in connection with such allocation.

*1.8 No Warranty; Liability for Environmental Contamination.*

THE ACQUIRED ASSETS ARE BEING TRANSFERRED "AS IS, WHERE IS, WITH ALL FAULTS." EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR IN THE ASSIGNMENTS CONTEMPLEATED HEREIN, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, INCLUDING REPRESENTATIONS AND WARRANTIES AS TO (i) MERCHANTABILITY; (ii) FITNESS FOR A PARTICULAR PURPOSE; (iii) THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR RECORDS FURNISHED TO BUYER IN CONNECTION WITH THE ACQUIRED ASSETS OR OTHERWISE CONSTITUTING A PORTION OF THE ACQUIRED ASSETS; (iv) THE PRESENCE, QUALITY, QUANTITY AND RECOVERABILITY OF HYDROCARBON RESERVES (IF ANY) ATTRIBUTABLE TO THE ACQUIRED ASSETS; (v) THE ABILITY OF THE ACQUIRED ASSETS TO PRODUCE HYDROCARBONS, INCLUDING PRODUCTION RATES, DECLINE RATES AND RECOMPLETION OPPORTUNITIES; (vi) GEOLOGIC OR GEOPHYSICAL CHARACTERISTICS OR INTERPRETATIONS; (vii) THE PRESENT OR FUTURE VALUE OF THE ANTICIPATED INCOME, COSTS OR PROFITS, IF ANY, TO BE DERIVED FROM THE ACQUIRED ASSETS; (viii) THE ENVIRONMENTAL CONDITION OF THE ACQUIRED ASSETS; (ix) ANY PROJECTIONS AS TO EVENTS THAT COULD OR COULD NOT OCCUR; (x) THE TAX ATTRIBUTES OF ANY ACQUIRED ASSET; (xi) ANY OTHER MATTERS CONTAINED IN OR OMITTED FROM ANY INFORMATION OR MATERIAL FURNISHED TO BUYER BY SELLER OR ANYONE ACTING ON SELLER'S BEHALF; AND (xii) THE COMPLETENESS OR ACCURACY OF THE INFORMATION CONTAINED IN THE FILES, DATA OR RECORDS OF SELLERS. ANY DATA, INFORMATION OR OTHER RECORDS FURNISHED BY SELLERS ARE PROVIDED TO BUYER AS A CONVENIENCE, AND BUYER'S RELIANCE ON OR USE OF THE SAME IS AT BUYER'S SOLE RISK. BUYER ACKNOWLEDGES THAT OIL AND GAS DEVELOPMENT MAY RESULT IN ENVIRONMENTAL CONTAMINATION, INCLUDING CONTAMINATION BY NATURALLY OCCURRING RADIOACTIVE MATERIAL AND ASBESTOS. BUYER REPRESENTS THAT IT HAS HAD AN OPPORTUNITY TO EXAMINE THE ACQUIRED ASSETS AND THEIR CONDITION AND HAS NONETHELESS CHOSEN TO PURCHASE THE ACQURIED ASSETS IN THEIR PRESENT CONDITION WITH ALL FAULTS EVEN THOUGH OWNERSHIP OF THE ACQUIRED ASSETS MAY RESULT IN LIABILITY INCLUDING LIABILITY FOR ENVIRONMENTAL REMEDIATION. SELLERS AND BUYER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE OPERATIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS PARAGRAPH ARE "CONSPICUOUS." SELLER SHALL CONVEY ALL OIL AND GAS LEASES WITH A SPECIAL WARRANTY OF TITLE.

18735549.2
233559-10002

### 1.9 Limitation of Damages for Breach of Warranty.

The Sellers' liability for breach of special warranty of title to any of the Oil and Gas Leases shall be limited to the values allocated to those assets in Exhibit B.

## ARTICLE II
## ASSETS

### 2.1 Acquired Assets

Subject to the terms and conditions hereof, Sellers hereby agree to sell, convey and assign to Buyer, and Buyer hereby agrees to purchase, all of Sellers' right, title and interest in and to the following (the "Acquired Assets"):

(a)     being all of the Working Interest (not less than the interests listed in Exhibit B) in the oil and gas leases, subleases, farmouts and other similar interests and rights to production, more particularly described in attached Exhibit A and made a part hereof for all purposes (the "Leases"), and those Lease interests located in, under or that may be produced from or attributable to (A) the lands covered by the Leases, and (B) the Leases and lands included in any units with which the Leases or the lands covered thereby may have been pooled, unitized or communitized (collectively, the "Assigned Leases and Interests");

(b)     being all of the Interest in all oil, gas, water, disposal, observation and injection wells located on the lands covered by the Leases or included in pooled acreage or units with which any Lease may have been pooled or unitized (the "Wells" and together with the Assigned Leases and Interests, the "Properties"), including, but not limited to, the Wells listed on Exhibit B, and all oil, gas and other Hydrocarbons produced from or attributable to the Wells, associated equipment and related property necessary to operate the wells in the manner they should be operated, including all lease automated custody transfer units ("LACTS"), tankage and associated infrastructure, equipment and vehicles necessary to ensure the continued operation of each producing unit located on the Properties, on lands pooled, unitized or communitized with any portion thereof, on lands located within any governmental drilling or spacing unit (if applicable) which includes any portion thereof, or on portions thereof associated with proved undeveloped reserves, whether producing, non-producing, plugged, unplugged, shut-in or temporarily abandoned, including those described on Exhibit B;

(c)     all hydrocarbons, including oil, gas, minerals, casinghead gas, coalbed methane, and other gaseous and liquid hydrocarbons, or any combination of the foregoing, sulfur extracted from hydrocarbons, and all other Lease substances (the "Hydrocarbons") produced from or attributable to the Properties produced after 7:00 a.m. on the Effective Date of this Agreement, and, all proceeds attributable thereto;

(d)     all equipment, machinery, fixtures and other tangible personal property and improvements located on, primarily used or held for use, or otherwise obtained in connection with

18735549.2
233559-10002

the ownership or operation of the Properties, including tanks, boilers, plants, buildings, field offices and other structures, fixtures, injection facilities, saltwater disposal facilities, compressors and other compression facilities (whether installed or not), pumping units, flow lines, pipelines, gathering systems, Hydrocarbon treating or processing systems or facilities, meters, machinery, pumps, motors, gauges, valves, power and other utility lines, roads, computer and automation equipment, telecommunications equipment, field radio telemetry and associated frequencies and licenses, pressure transmitters, central processing equipment and other appurtenances, improvements and facilities (collectively, the "Equipment") including, but not limited to the items listed in attached Exhibit A – Section VI;

(e)      all pipes, casing, tubing, tubulars, fittings, and other spare parts, supplies, tools, and materials located on, used or held for use on or held as inventory in connection with the ownership or operation of the Properties and Equipment;

(f)      to the extent transferable pursuant to applicable legal requirements, all governmental (whether federal, state or local) permits, licenses, authorizations, franchises, grants, easements, variances, exceptions, consents, certificates, approvals and related instruments or rights of any governmental authority or other third party, and any writ, judgment, decree, award, order, injunction or similar order, ruling, directive or other requirement of any governmental authority (in each such case whether preliminary or final) required of any Sellers for the ownership, operation or use of the Properties or Equipment (collectively, the "Permits");

(g)      contracts (other than the Excluded Contracts), including sales and purchase contracts, operating agreements, exploration agreements, development agreements, balancing agreements, farmout agreements, service agreements, transportation, processing, treatment and gathering agreements, equipment leases and other contracts, agreements and instruments insofar as they relate to any other asset (collectively, the "Assigned Contracts");

(h)      all easements, permits, licenses, rights of way, surface rights and leases and water rights associated with the Properties;

(i)      except with respect to the Excluded Assets and the Excluded Liabilities, all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of any Sellers to the extent related to the Acquired Assets and arising or relating to events occurring from and after the Effective Date or related to the Assumed Liabilities;

(j)      all information, books, databases, files, records and data (other than the Excluded Records), whether in written or electronic format, relating to any Acquired Asset or to any Assumed Liabilities (collectively, the "Records"), which Records shall include all reservoir, land, operation and production files and records, inclusive of lease records, well records, division order records, property ownership reports and files, contract files and records, well files, title records (including abstracts of title, title opinions and memoranda, and title curative documents),

correspondence, production records, prospect files and other prospect information, supplier lists and files, customer lists and files; and all other data including proprietary and non-proprietary engineering, geological, geophysical and seismic data, files and records (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent)), inclusive of maps, logs, core analysis, formation tests, cost estimates, studies, plans, prognoses, surveys and reports, and including raw data and any interpretive data or information relating to the foregoing, and any other proprietary data in the actual possession or control of any Sellers or which any Sellers has the right to obtain (either without the payment of money or delivery of other consideration or unduly burdensome effort or, upon Buyer's written election, at Buyer's expense) and relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the other Acquired Assets; provided that if any Records can only be assigned to Buyer with a fee or penalty, Sellers shall bear responsibility for such fee or penalty;

(k)     all access agreements, water easements, rights of way, roads, power purchase agreements, and pipeline rights of way relating to the Properties;

(l)     all undeveloped leaseholds and right and title to agreements associated with Assigned Leases and Interests, as well as any federal extensions received;

(m)     with respect to the Properties only, all system software and reserve valuation software used to manage assets, including Daily Production Reports, Daily LOEs, maps, all subsurface 3D, 3D Seismic data and licenses, Petrel data, eoxmaps.com, all mapping data, Daily Ops Report, WINR, entire sequel database holding all daily well data since inception, a fully replicated PURE storage array where data is housed, and all hardware on which such software and data is maintained (in each case, only to the extent not subject to a material restriction against assignment without prior counterparty written consent); provided that to the extent transfer of the any of the foregoing requires counterparty consent, Sellers shall cooperate with Buyer to obtain counterparty consent, and if the counterparty does not consent, Sellers shall, so long as not prohibited by applicable legal requirements, seek to assume and assign the foregoing under Bankruptcy Code Section 365; provided further that any Cure Costs associated therewith shall be added to the Purchase Price;

(n)     eighteen (18) mile $CO_2$ pipeline, including all connections, and related equipment, at the Properties; and

(o)     with respect to the Properties only, all trade credits, accounts receivable, unearned accounts receivable from Hydrocarbons, notes receivable, take or pay amounts receivable, and other receivables, with respect to any period of time prior to closing.

7
Purchase and Sale Agreement

## 2.2 Excluded Assets

The following assets are not included in the Acquired Assets to be sold to Buyer ("Excluded Assets"): (i) cash, (ii) cash equivalents (excluding receivables and the proceeds thereof), (iii) income tax receivables, (iv) deferred tax assets, (v) employee advances, (vi) prepaid insurance, (vii) contracts and leases that are not Designated Contracts, (viii) the Purchase Price and all rights of the Sellers under this Agreement, (ix) all personnel records and other books, records, and files that the Sellers are required by law, if any, to retain in their possession, (x) any claim, right or interest of the Sellers in or to any refund, rebate, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, for tax payments and obligations arising prior to the Effective Date (xi) applicable federal, state, and local taxes, (xii) any books and records relating to any of the foregoing, (xii) the wind farm lease with EDF and (x) any other non-Caprock oil producing assets owned by the Sellers that are unrelated to the Properties.

## 2.3 Assumed Contracts and Cure Costs

(a)    Available Contracts. The Sellers will promptly provide the Buyer with a list of all of their assets and liabilities, including all of the Sellers' executory contracts and unexpired leases (each an "Available Contract", within ten (10) days, and collectively the "Available Contracts") and the estimated amount to cure monetary defaults thereunder (such list may from time to time be amended or supplemented with written notice to the Buyer, the ("Contract Schedule"). The Sellers agree to update, amend and supplement the Contract Schedule promptly upon learning of any omission or inaccuracy to such schedule, and at any time as may be reasonably requested by the Purchaser.

(b)    Assumed Contracts. The Buyer will provide the Sellers with a list of the Available Contracts listed on the Contract Schedule received from the Sellers that the Buyer desires to be assumed by the Sellers party in Sellers' Bankruptcy and assigned, transferred and conveyed to the Buyer (and as may be modified by the Buyer) at any time prior to the closing of the Agreement, each a "Desired Contract" and collectively, the "Desired Contracts", which shall include each and every Assigned Contract to the extent it is an executory contract or unexpired lease. As promptly as practicable following the designation by the Buyer of any Available Contract as a Desired Contract, the Sellers shall take all necessary actions to determine the cure costs with respect to such Desired Contract and serve a notice of assumption of such Desired Contract on the counterparty thereto and shall otherwise take all necessary actions to effect the assumption and assignment of such Desired Contract by the applicable Sellers in accordance with the Bankruptcy Code as of the Closing of the Agreement.

(c)    Excluded Contracts. The Buyer shall have the right prior to the Closing to remove any Available Contracts from the list of Desired Contracts and, after such removal, such removed Available Contract shall no longer be a Desired Contract and the Buyer shall have no obligation to pay any amounts to cure defaults thereunder or take any further action with respect thereto; provided, however, the Buyer shall retain the right to add such Available Contract as a Desired Contract at any time prior to the Closing.

18735549.2
233559-10002

(d)     Cure Costs.  At the Closing, the Buyer shall pay all agreed upon Cure Costs with respect to the Desired Contracts in the amount listed on the Contract, and the Buyer shall provide adequate assurance of future performance, in a form acceptable to Buyer and third party. Except for amounts listed on the Contract Schedule with respect to the Desired Contracts, neither the Buyer nor any of their subsidiaries or affiliates shall have any liability or obligation to any person for any default under or cure costs related to any Available Contract of any Sellers existing at or prior to the closing of the Agreement. In the event that any executory contract or unexpired lease is added to the Contract Schedule in accordance with Paragraph (a) above and the Buyer elects to list such Available Contract as a Desired Contract, the Buyer, in its sole discretion, will pay the Cure Costs associated with such additional Desired Contract. In addition, in the event that the Buyer determines that any executory contract or unexpired lease exists that is not listed on the Contract Schedule on or prior to the end of the closing of the Agreement, (a) Buyer shall have the right to designate any such executory contract or unexpired lease as a Desired Contract, (b) the Sellers shall assume and assign such additional Desired Contract to the Buyer within twenty-three (23) calendar days thereafter by order of the Bankruptcy Court, in form and substance acceptable to Buyer in its sole discretion and (c) the Buyer will pay the cure cost associated with such additional Desired Contract at such time.  In the event that any cure cost associated with any Desired Contract is found to be greater than the amount listed on the Contract Schedule, then the amount of the Purchase Price allocated to cure defaults under the Desired Contracts shall be increased in an equivalent amount of such increase.

(e)     Adequate Assurance.  Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court any evidence reasonably necessary to prove adequate assurance of future performance, in a form acceptable to Buyer and third party, necessary to effect the assumption and assignment of the Desired Contracts.

(f)     Assumption and Assignment of Contracts to Buyer.  At the closing, the Sellers shall assign to the Buyer each of the Desired Contracts. In connection with the assumption and assignment of the Desired Contracts, the Buyer shall pay cure costs, that are acceptable to Buyer, which the Bankruptcy Court, pursuant to a Final Order, orders to be paid in connection with the Sellers' assignment to Buyer of such Desired Contracts in accordance with section 365 of the Bankruptcy Code.

## ARTICLE III
## LIABILITIES

### 3.1 Assumed Liabilities

On the terms and subject to the conditions set forth in this Agreement, from and after Closing, Buyer shall assume and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Sellers existing as of the Effective Date (collectively, the "Assumed Liabilities"):

(a)     any Cure Costs that Buyer is required to pay pursuant to *Section 2.3*;

9
Purchase and Sale Agreement

(b)    those liabilities and obligations arising from events occurring on or after the Effective Date under any Desired Contracts or relating to the Acquired Assets, subject to applicable caps on assumed liabilities, as mutually acceptable to Buyer and any third-parties.

(c)    Taxes to the extent set forth in *Section 1.4 and Section 1.5*; and

(d)    All liability that may arise under applicable environmental laws (1) to restore the surface of the Properties or to bring the Properties into compliance with applicable environmental laws and (2) to properly plug and abandon and decommission Wells, Equipment and any other Acquired Assets, which arise after the Effective Date.

(e)    All liability for royalties that arise from production occurring after the Effective Date, and all liability for shut-in royalties, lease rentals, and other leasehold obligations attributable to periods after the Effective Date.

(f)    All liability for joint interest billings for costs accruing after the Effective Date.

### 3.2 Excluded Liabilities.

The Buyer shall not assume or be deemed to have assumed any liabilities of the Sellers other than the Assumed Liabilities, including, without limitation, any liabilities associated with the Excluded Assets and specifically including, without limitation, any other existing indebtedness or encumbrances, any federal, state, or local tax liabilities, any charge back liabilities owed to any state or federal governmental agency, and any obligations pursuant to the Sellers' insurance obligations and other employee-related liabilities, in each case to be assumed, if at all, only in Buyer's sole discretion by a signed writing and court order (collectively, the "Excluded Liabilities"). For purposes of clarity, and without limitation of the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers, as applicable: (a) all indebtedness of Sellers; all guarantees of third party obligations by Sellers and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit; and all Liabilities of Sellers to any owner or former owner of capital stock or warrants, or holder of Indebtedness; (b) all taxes of Sellers, except as set forth in *Section 1.4* and *Section 1.5*; (c) all actions and proceedings initiated prior to the Closing, or that are initiated after Closing and relate to any Excluded Liabilities, and all Liabilities arising as a result of any such actions or proceedings; (d) all Liabilities attributable to, arising out of or in connection with, or that are based upon accounting for, failure to pay or the incorrect payment to any royalty owner, overriding royalty owner, or other interest holder under the Leases insofar as the same are attributable to periods of production prior to or as of the Effective Date; (e) all Liabilities attributable to, arising out of or in connection with, or that are based upon (1) the acts or omissions of Sellers as operator of any of the Acquired Assets prior to the Closing; (2) property damage or bodily injury, illness or death arising out of, incident to or in connection with operations on any of the Acquired Assets prior to the Closing, (3) disposal or transportation of any hazardous substances from the Acquired Assets prior to the Closing, (4) Liabilities of any Sellers to any affiliates, or (5) except for the Assumed Liabilities specifically described above, the ownership, operation, use, maintenance or other disposition of any of the

Acquired Assets prior to the Closing; (f) other than the Assumed Liabilities pursuant to Section 3.1, all Liabilities attributable to, arising out of, or in connection with the failure by any Sellers or any of its affiliates to comply with any legal requirements or order by any governmental authority including any such obligations or Liabilities arising as a result of any Sellers' failure to comply with the terms of any legal requirements; (g) other than as set forth in *Section 3.1*, all Liabilities (whether arising before, on or after Closing) with respect to or otherwise attributable to, arising out of or in connection with any employee or former employee of any Sellers or any affiliate of any Sellers (or any individual who applied for employment with any Sellers) with respect to employment or application for employment with either Sellers or any affiliate of Sellers; (h) all trade accounts payable, all accrued operating expenses and other current liabilities of Sellers related to the Acquired Assets; (i) all Liabilities under, arising out of or related to any of the Excluded Assets; (j) all Liabilities with respect to any costs, fees and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of Sellers in connection with or arising from the Bankruptcy Case or the transactions contemplated by this Agreement; (k) all Liabilities relating to any theories of any Legal Requirement or equity involving successors or transferees; and (l) all Liabilities and obligations of Sellers under this Agreement.

## ARTICLE IV
## SELLERS REPRESENTATIONS AND WARRANTIES

Sellers jointly and severally represent and warrant to Buyer as of the Effective Date that:

**4.1 *Organization, Existence*.**

Each Seller is a limited liability company duly formed and validly existing under the Laws of the State of Texas. Subject to the limitations imposed on Sellers as a result of having filed the Petitions, Sellers have all requisite power and authority to own and operate their property (including, without limitation, the Acquired Assets) and to carry on their business as now conducted.

**4.2 *Authorization*.**

Subject to the entry by the Bankruptcy Court of an order approving this Agreement (the "Sale Order") and such other authorization as is required by the Bankruptcy Court, Sellers have full power and authority to enter into and perform this Agreement and the transactions contemplated herein, and this Agreement constitutes (and the other instruments delivered at the Closing (defined below), when executed and delivered, will constitute) the legal, valid and binding obligation of Sellers, enforceable in accordance with its terms, except as limited by bankruptcy or other laws applicable generally to creditor's rights and as limited by general equitable principles.

18735549.2
233559-10002

### 4.3 No Conflicts.

Neither the execution and delivery of this Agreement nor the consummation or performance of the transactions contemplated hereby will (i) result in any default under any agreement or instrument to which a Sellers is a party or by which any of the Acquired Assets is bound, (ii) violate any provision of a Sellers's organizational or governing documents, (iii) violate any order, writ, injunction, permit, decree, statute, rule or regulation applicable to a Sellers or to any of the Acquired Assets, or (iv) require any filing, consent or approval under any statute, rule or regulation (except for approvals required to be obtained from governmental entities who are lessors under the Leases (or who administer such Leases on behalf of such lessors) that are customarily obtained post-closing);

### 4.4 Bankruptcy.

From the Petition Date through the Effective Date, each Seller has been at all times in the Bankruptcy Case debtor-in-possession pursuant to Section 1107 of the Bankruptcy Code, no trustee or examiner has been appointed in the Bankruptcy Case, and no motion has been filed requesting the appointment of a trustee or examiner.

### 4.5 Required Notices.

Each Seller has complied with all notice provisions of the Bankruptcy Code. Without limiting the generality of the foregoing, each Seller has delivered adequate notice of the sale of the Acquired Assets free and clear of all claims and encumbrances and Excluded Liabilities to (a) each person who is the beneficiary of or a holder of any claim or encumbrance in and to any of the Acquired Assets; (b) each counterparty to each of the Desired Contracts and each of the Excluded Contracts; (c) each person holding or asserting any net revenue interest or working interest in the Acquired Assets or to whom there are owed any amounts; (d) each person who is the beneficiary of any lease burden burdening the Leases or production therefrom; and (e) each person who is a holder of a claim against a Sellers.

### 4.5 Foreign Person.

Neither Seller is a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

### 4.6 Litigation.

As of the Effective Date, except for the pendency of the Bankruptcy Case and as set forth on Exhibit C, there are no pending suits, actions, and none have been threatened, relating to any of the Acquired Assets, including, without limitation, any actions challenging or pertaining to a Seller's title to any of the Acquired Assets or affecting the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

18735549.2
233559-10002

### 4.7 Royalties, Etc.

Except for such items that are being held in suspense as permitted pursuant to applicable law, each Seller has paid all royalties, overriding royalties and other burdens on production due by each Seller with respect to the Acquired Assets.

### 4.8 Commitments and Obligations.

There are no outstanding authorities for expenditure or other commitments to make capital expenditures relating to any portion of the Acquired Assets that will be binding on Buyer after the Effective Date and:

(a) None of the Leases or contracts relating to any of the Acquired Assets contains any express provision obligating a Seller to drill any wells.

(b) No Seller has not elected to participate in any operation or activity proposed with respect to any of the Acquired Assets or entered into any agreement that would diminish its rights in any of the Acquired Assets.

(c) There are no hedges that will be binding on Buyer or the Acquired Assets after the Effective Date.

(d) There exist no material agreements or arrangements for the sale of production from the Acquired Assets (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) other than production sales contracts or arrangements that are cancellable on 90 days notice or less without penalty or detriment.

(e) Neither Seller is obligated pursuant to any take or pay provision, advance payment or similar payment to provide any Hydrocarbons produced from or allocable to the Acquired Assets without payment therefor at the time of delivery.

(f) There are no imbalances (e.g. a situation where a Seller has taken more or less Hydrocarbons from a Well than its ownership of the Acquired Assets would entitle it to receive) associated with the Acquired Assets.

(g) Except for operations for the drilling of the well or wells identified on Exhibit B, neither Seller has conducted or participated in oil and gas exploration, development or production operations on the Acquired Assets, or any lands pooled or unitized therewith.

(h) Neither Seller has any knowledge of any pending vote, or any requests for a vote (whether written or oral), to have a Seller removed as the named "operator" from any of the Acquired Assets for which a Seller is currently designated as the "operator." There are no agreements binding a Seller to vote its interests in favor of any other person or entity to become operator with respect to any wells drilled on the Acquired Assets.

18735549.2
233559-10002

(i)      Each Seller has timely and properly paid all taxes that said Seller is obligated to pay with respect to the Acquired Assets, all tax returns required to have been filed with respect to the Properties, Acquired Assets or Sellers' operations with respect thereto have been duly and timely filed, there has been no unresolved issue or claim raised or adjustment proposed to Sellers by any taxing authority with respect to liabilities, assessments or deficiencies with respect to taxes relating to the ownership or the operation of the Properties and the Acquired Assets, and no Seller nor any of its affiliates has received notice that any such issue or claim is pending.

(j)      Seller has furnished to Buyer copies of all title opinions, title reports and other title information in the possession of Seller, or that Seller is able to obtain concerning the title to the oil and gas leases the subject of this Agreement.

### 4.9  *As Is / Where Is Sale.*

The Buyer is acquiring the Acquired Assets at the Closing "as is, where is" except as otherwise expressly provided in this Agreement. The Sellers are making no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Acquired Assets, except as otherwise expressly stated herein.

Notwithstanding the foregoing, for the avoidance of doubt, and with the exception of the Assumed Liabilities, Buyer is buying the Acquired Assets free and clear of all liabilities, whatsoever, and also free and clear of set-off rights to the full extent allowable under section 363(h), (f), (m) and (n) of the Bankruptcy Code.

### 4.10  *Government Authorization.*

All governmental licenses, permits, variances, waivers, authorizations and similar rights ("Governmental Authorizations") that are necessary for the ownership and current operation of the Acquired Assets are in full force and effect. No proceedings are pending or, to Sellers' knowledge, threatened that might result in any modification, revocation or suspension of any Governmental Authorizations. The Sellers have operated the Acquired Assets in all material respects in accordance with the conditions and provisions of the Governmental Authorizations and with all applicable laws, regulations, orders, and similar legal requirements and are in compliance in all material respects with all obligations thereunder or imposed thereby. There are no outstanding notices of violation, orders or unresolved consent decrees from or with the State of Texas or State of New Mexico, as applicable, relating to the Acquired Assets.

### 4.11  *Environment.*

Sellers are in material compliance with all applicable laws relating to protection of the environment or health and safety. Sellers represent and warrant that there are no pending citations, notices of violation, administrative orders, complaints, judgments, consent orders or consent agreements issued to or entered into by Sellers relating to any such laws, which are applicable to

14
Purchase and Sale Agreement

the Acquired Assets, except as disclosed on Exhibit D hereto, and Sellers are unaware of any environmental violations on the oil and gas leases and other properties constituting part of the Acquired Assets..

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers the following:

### 5.1 Organization; Existence.

Buyer is a Corporation duly formed and validly existing under the laws of the State of Texas. Buyer has all requisite power and authority to own and operate its property (including, at Closing, the Acquired Assets) and to carry on its business as now conducted.

### 5.2 Authorization.

Buyer has full power and authority to enter into and perform this Agreement to which it is a party and the transactions contemplated herein. The execution, delivery and performance by Buyer of this Agreement has been, and the execution, delivery and performance by Buyer of all other documents delivered pursuant to this Agreement will be when delivered, duly and validly authorized and approved by all necessary corporate action on the part of Buyer.

### 5.3 No Conflicts.

The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational or other governing documents of Buyer, (b) result in a default or the creation of any encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license or other agreement to which Buyer is a party or by which Buyer or any of its property may be bound or (c) violate any law applicable to Buyer or any of its property, except in the case of clauses (b) and (c) where such default, encumbrance, termination, cancellation, acceleration or violation would not have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement.

### 5.4 Consents.

There are no consents or other restrictions on assignment, including requirements for consents from third parties to any assignment, in each case, that would be applicable in connection with the consummation by Buyer of the transactions contemplated by this Agreement.

18735549.2
233559-10002

### 5.5 Bankruptcy.

There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Buyer's knowledge, threatened in writing against Buyer.

### 5.6 Litigation.

There is no investigation, suit, action or litigation by any person or by or before any governmental authority, and no legal, administrative or arbitration proceedings pending, or to Buyer's knowledge, threatened against Buyer, or to which Buyer is a party, that would affect the ability of Buyer to consummate the transactions contemplated by this Agreement.

### 5.7 Financing.

Buyer is financing the purchase and shall have as of the Effective Date, sufficient funds with which to pay the Purchase Price and consummate the transactions contemplated by this Agreement and, following Closing, Buyer will have sufficient funds to pay any adjustments to the Purchase Price and meet its other payment obligations under this Agreement.

### 5.8 Independent Evaluation.

Buyer is sophisticated in the evaluation, purchase, ownership and operation of oil and gas properties and related facilities. In making its decision to enter into this Agreement and to consummate the transaction contemplated herein, Buyer (a) has relied or shall rely solely on its own independent investigation and evaluation of the Acquired Assets and the advice of its own legal, tax, economic, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by any representatives or consultants or advisors engaged by Sellers, and (b) has satisfied or shall satisfy itself through its own due diligence as to the environmental and physical condition of and contractual arrangements and other matters affecting the Acquired Assets.

### 5.9 Accredited Investor.

Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended, and will acquire the Acquired Assets for its own account and not with a view to a sale or distribution thereof in violation of such Law and the rules and regulations thereunder, any applicable state blue sky Laws or any other applicable securities Laws.

## ARTICLE VI
## CONDITIONS PRECEDENT TO CLOSING

### 6.1 Buyer's Conditions to Closing

18735549.2
233559-10002

Buyer's obligation to purchase the Acquired Assets and to take the other actions required to be taken by Buyer at the Closing shall be subject to the satisfaction of the following conditions (any of which may be waived in writing by Buyer):

(a)     The representations and warranties of Sellers in *Article IV* shall be true and correct.

(b)     The Sellers shall have performed, satisfied and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by them on or prior to the Effective Date.

(c)     The Sellers shall have executed and delivered to the Buyer the Assignment and Bill of Sale, dated and effective as of the Effective Date.

(d)     The Sellers shall have delivered to the Buyer all other documents required to be delivered by them under this Agreement and all such documents shall have been properly executed by each of them.

(e)     The Buyer shall have received any third party consents, the requirements of which have not been negated by an order of the Bankruptcy Court, and governmental approvals, in form and substance satisfactory to Buyer in its sole and absolute discretion, effective as of the Effective Date.

(f)     The Buyer shall have entered into new or modified contracts, acceptable to Buyer in its sole discretion, effective as of closing, with all persons identified by Buyer prior to the closing, including critical vendors and suppliers.

(g)     The Sellers shall have delivered all schedules, documents and exhibits attached to or otherwise required by this Agreement and said schedules and exhibits shall be acceptable to Buyer in its sole and absolute discretion.

(h)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become final and non-appealable.

(i)     All of the Desired Contracts shall have been validly assumed and assigned to the Buyer under section 365 of the Bankruptcy Code pursuant to the Sale Order.

(j)     The Sale Order shall be in a customary form for Section 363 sales, acceptable to the Buyer in its sole and absolute discretion, and shall provide that the sale of the Properties and the Acquired Assets is made pursuant to section 363(f) of the Bankruptcy Code; free and clear of all liens, claims, encumbrances, interests, and rights of set-off, whether known or

17
Purchase and Sale Agreement

unknown, disputed, contingent, actual, or otherwise, arising prior to closing; and to Buyer, as a good faith purchaser, with no successor liability.

(k)     Buyer shall not have received any notice pursuant to the applicable section of this Agreement that, individually or in the aggregate, could be reasonably expected to be materially adverse to the condition (financial or otherwise), of properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets.

(l)     No event shall have occurred that, individually or in the aggregate, could be reasonably expected to result in a material adverse change in the condition (financial or otherwise), of properties, assets, liabilities, businesses, operations, results of operations or prospects of the business or the Acquired Assets.

(m)     Buyer shall have received all consents and contract modifications which Buyer may require, with all Bankruptcy Court approvals required for the same, including, without limitation, leases of key equipment, other agreements, and utility contracts.

(n)     Sellers shall have furnished to Buyer a list of cure costs, along with written confirmation from each party to whom the cure costs are owed.

(o)     The amount of cure costs in connection with the Acquired Assets are acceptable to Buyer.

(p)     Sellers shall have furnished to Buyer a list and copies of any state or federal governmental orders or notices concerning (1) surface damages, which need to remedied, (2) any well, which needs to be tested, reworked or plugged; (3) any reports or information which need to be filed or furnished; (4) any deadlines for any payment, operation, renewal or extension; (5) any demand for partial or total release; (6) any requirement for posting a bond or other security; (7) any notice of taxes due or past due; and (8) any notice of penalty or proposed penalty.

(q)     Sellers shall have furnished to Buyer a list and a copy of each Oil and Gas Lease, Amendment and Ratification.

(r)     Sellers shall have furnished to Buyer a list and a copy of each Equipment Lease and any Consent required of an Assignment from Sellers to Buyer.

(s)     Sellers shall have furnished to Buyer a list and a copy of each Vehicle Lease and any Consent required of an Assignment from Sellers to Buyer.

(t)     Sellers shall have furnished to Buyer a list and a copy of each Surface Lease.

(u)     Sellers shall have furnished to Buyer a list of all utility or power providers,

18735549.2
233559-10002

including name, address, description of services provided and monthly statements for the last twelve (12) months, together with any contracts in effect.

(v)     Sellers shall have furnished to Buyer a list of operating bonds, required by any Lessors and/or governmental entity, including the amount of the bond, type of bond and how often required to be renewed.

(w)     Sellers shall have furnished to Buyer any written Consents, Approvals, or Amendments required by any contracts, Oil and Gas Leases, Surface Leases and Easements to be assigned by Sellers to Buyer.

(x)     Sellers shall have furnished to Buyer a list of any Consents required for the  delivery of seismic data or other information furnished as part of the Acquired Assets.

(y)     Sellers shall have furnished to Buyer a list of all funds in suspense, including name of owner, date suspended, and reason for suspense.

(z)     Sellers shall have furnished to Buyer a list of any engineering, geological, geophysical, and seismic data files, and records, to which transfer or Assignment is restricted without Consent.

(aa)     Sellers shall have furnished to Buyer a list of all undeveloped Oil and Gas Leases and related agreements.

(bb)     Sellers shall have furnished to Buyer a list of system software and reserve evaluation software used to manage the property described in Exhibit A. Section 1.

(cc)     Sellers shall have furnished to Buyer a list of and copies of any Deeds to surface tracts to be conveyed by Sellers to Buyer.

(dd)     Sellers shall have furnished to Buyer a list of and copies of each Surface Lease to be assigned to Buyer.

(ee)     Sellers shall have furnished to Buyer a list of all insurance being carried in connection with the Acquired Assets, including the types of insurance coverage, amounts of insurance coverage, name and addresses of insurers, policy expiration dates, and copies of the policies.

(ff)     Sellers shall have furnished to Buyer a  list of any notices received of any environmental damage on the Leases, Easements or land the subject of this Agreement, or the violation of environmental laws, rules, regulations, or orders and all documents received or relevant to such matters.

(gg)     Sellers shall have furnished to Buyer a  list of each person owning or

18735549.2
233559-10002

holding or asserting any working interest, net revenue interest, overriding royalty interest, production payment, or other interest in the Acquired Assets, and the amount, if any, owed to each owner of such interest.

(hh)  Sellers shall have furnished to Buyer a list of each person who is the holder of a claim against each Lease, Easement or other property to be Assigned to Buyer and the amount of each claim.

(ii)  Sellers shall have furnished to Buyer a copy of each Joint Operating Agreement in effect with respect to the Acquired Assets.

(jj)  Sellers shall have furnished to Buyer all Bankruptcy Court Orders necessary to the sale of the Acquired Assets, which shall be final and unappealable.

(kk)  Sellers shall have furnished to Buyer a list and copy of all Title Opinions, covering all of the property covered by the Leases, showing good title into Sellers or Legacy Reserves Operating, LP.

(ll)  Sellers shall have furnished to Buyer a list and copies of all Unit Agreements covering all or any portion of the Leases the subject of this Agreement.

(mm)  Sellers shall have furnished to Buyer copies of all Oil Sales Contracts and Gas Sales Contracts.

(nn)  Sellers shall have furnished to Buyer a transfer of all royalty funds held in suspense.

(oo)  Sellers shall have furnished to Buyer all completed Requests for Approval of Transfer, Transfer forms and other documents, required by state and federal governmental entities, in order to transfer the leases and operation of the leases.

(pp)  Sellers shall have obtained the approval of the transfer of all oil and gas leases and operation of the leases, required by state or federal governmental agencies.

(qq)  Sellers shall have prepared and furnished to Buyer any Change of Ownership forms required to transfer water licenses to Buyer, together with evidence that all licenses are in effect and that the uses of water, currently in place, have been approved.

(rr)  Sellers shall have furnished to Buyer, written evidence that all annual Rentals under all leases have been paid to date.

(ss)  Sellers shall have tendered their resignation as Operator of the leases and furnished to Buyer a nomination of Buyer as Successor Operator, as required by any Unit Agreement, Joint Operating Agreement and tendered all fully completed and executed Transfer

20
Purchase and Sale Agreement

of Lease forms and Transfer of Opearting forms required by state or federal law, rule or regulation.

    (tt)    Buyer's attorneys shall have satisfied themselves that Seller has good indefeasible title to the Oil and Gas Leases and other Acquired Assets, free and clear of all liens and encumbrances.

    (uu)    The closing of a sale of Panther Canyon Ranch, containing 4,593.4 acres in Stonewall County, Texas from the Bill and Gayle Briscoe Family Ttrust and Douglas Friedel to AMG Salt Fork, LLC, including all water rights.

### 6.2 Sellers' Conditions to Closing

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment (or waiver by Sellers), on or prior to the Closing of each of the following conditions:

    (a)    The representations and warranties of Buyer set forth in *Article V* shall be true and correct.

    (b)    Buyer shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Effective Date.

    (c)    No material suit, action or other proceeding instituted by a third party shall be pending before any governmental authority seeking to restrain, prohibit, enjoin or declare illegal, or seeking substantial damages in connection with, the transactions contemplated by this Agreement. No order, award or judgment shall have been issued by any governmental authority or arbitrator to restrain, prohibit, enjoin, or declare illegal, or awarding substantial damages in connection with, the transactions contemplated by this Agreement.

    (d)    The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect and not stayed and shall not have been reversed or modified since the date of its entry, the time provided by applicable Law to appeal or request modification or reconsideration of the Sale Order shall have passed and no appeals or requests for modifications or reconsideration shall have been filed prior to such time.

    (e)    Buyer shall have delivered (or be ready, willing and able to deliver at Closing) to Sellers the documents and other items required to be delivered by Buyer under this Agreement.

18735549.2
233559-10002

# ARTICLE VII
# CLOSING

### 7.1 Date and Place of Closing

Subject to the terms and conditions of this Agreement, the sale by Sellers and the purchase by Buyer of the Acquired Assets pursuant to this Agreement (the "Closing") shall occur on or before March 31, 2020, or such other date as Buyer and Sellers may agree upon in writing (the "Effective Date"), at Sellers' offices.

### 7.2 Closing Obligations

At the Closing, (i) Sellers shall convey the Acquired Assets to Buyer by:

(a)     an Assignment and Bill of Sale for each County in which the Leases are located, conveying the Oil and Gas Leases the subject of this Agreement, in substantially the form attached hereto as Exhibit E (the Assignment and Bill of Sale);

(b) Assignments on state approved forms for all Acquired Assets subject to state oil and gas leases and Assignments on Bureau of Land Management forms for all Acquired Assets subject to federal oil and gas leases;

(c) an Assignment of all $CO_2$ Pipeline Easements, Water Pipeline Easements, Oil Pipeline Easements, Gas Pipeline Easements, Power Line Easements and Road Easements, including any Consents required;

(d) an Assignment of all Vehicle Leases, including any Consents required;

(e) an Assignment of all Oil and Gas Purchase Contracts, including any Consents required;

(f) a Special Warranty Deed covering, the surface estate only in, 10 acres used as a storage yard;

(g) an Assignment of all Water Licenses, including any Consents required;

(h) an Assignment of all Surface Leases, including any Consents required;

(i) a Bill of Sale, covering all equipment, fixtures and other other tangible personal property, including, but not limited to, pipe, casing, tubing, tubular fittings, spare parts, supplies, tools and materials, used, or held for use, in the storage yards; all information, books, databases, files, records, computers, software, title opinions, memorandum, title curative documents; correspondence; production records; prospect files, and other prospect information; supplier lists and files; customer lists and files; and all other data, including proprietary and non-proprietary,

18735549.2
233559-10002

engineering, geology, geological, geophysical, and seismic data, files and records, inclusive of maps, logs, core analysis, formation tests, cost estimates, studies, plans, prognosis, surveys and reports, including raw data and interpretive data or information relating to the foregoing and any other proprietary data, in the actual possession and control of Sellers which Sellers have the right to obtain relating to the ownership and operation, development, maintenance, repair of or the production gathering, treatment processing, storing, sale or disposal of hydrocarbons or produced water from the Acquired Assets, all system software, reserve evaluation software used to manage the Acquired Assets, including daily production reports, daily Logs; all maps, all subsurface 3d Seismic data and licenses, petrel data, eox maps.com, all mapping data, daily ops reports, WINR, entire sequel data base holding all daily well data since inception; a fully replicated pure storage allay where data is housed; and all hardware on which such software and data is maintained.

Upon receipt of the above by Buyer and satisfaction of the conditions, set forth in Section 6.1 above, Buyer shall pay the Purchase Price to Sellers by wire transfer of immediately available funds to an account designated in writing by Sellers.

### 7.3 After the Closing.

       (i)    After the Closing Date, Sellers and Buyer, at the request of the other and without additional consideration, shall execute and deliver, or shall cause to be executed and delivered, from time to time such further instruments of conveyance and transfer and shall take such other action as the other reasonably may request to convey and deliver the Acquired Assets to Buyer and to accomplish the orderly transfer of the Acquired Assets to Buyer in the manner contemplated by this Agreement. After the Closing, the Parties will cooperate to have all proceeds received attributable to the Acquired Assets be paid to the proper Party under this Agreement and to have all expenditures to be made with respect to the Acquired Assets be made by the proper Party under this Agreement. To the extent a Party receives funds after the Closing Date to which another Party is entitled, the receiving Party will promptly transfer such funds to the Party so entitled. To the extent a Party receives any invoice or statement after the Closing Date that is the responsibility of another Party, the receiving Party will promptly send the invoice or statement to the appropriate Party.

       (ii)    Operation of the Acquired Assets after the Closing. It is expressly understood and agreed that Sellers shall not be obligated to continue operating any of the Acquired Assets following the Closing, and Buyer assumes full responsibility for operating (or causing the operation of) all Acquired Assets following the Closing. Sellers do not warrant or guarantee that Buyer will become the operator of the Acquired Assets or any portion of the Acquired Assets, as such matter will be controlled by the applicable joint operating agreement(s). Without implying any obligation on a Seller's part to continue operating any Acquired Assets after the Closing, if a Seller elects to continue to operate any Acquired Assets following the Closing at the request of Buyer or any Third Party working interest owner, due to constraints of applicable joint operating agreement(s), failure of a successor operator to take over operations or other reasonable cause, the continued operation by Sellers shall be for the account of Buyer, at the sole risk, cost and expense of Buyer. Should a Seller, at Buyer's request, elect to continue to operate any of the Acquired

18735549.2
233559-10002

Assets after the Closing, then the Seller will undertake those activities on Buyer's behalf and at Buyers' expense. Buyer will pay any such Seller a reasonable fee for its efforts, the fee to be agreed between Buyer and such Seller before a Seller undertakes any such activitites. Buyer releases and agrees to indemnify Sellers from all claims, losses, damages, costs, expenses, causes of action and judgments of any kind or character (INCLUDING THOSE RESULTING FROM SELLERS' SOLE, JOINT, COMPARATIVE OR CONCURRENT NEGLIGENCE OR STRICT LIABILITY) with respect to (a) continued operations by Sellers, (b) Buyer's assumption of operations from Sellers, and (c) compliance with the terms of any applicable joint operating agreement related to the election of a successor operator. Buyer shall conduct or cause to be conducted all operations on the Acquired Assets after Closing in a good and workmanlike manner and in compliance with all applicable Law and agreements.

### 7.4 Termination of Agreement

    **7.4.1 Right of Termination.** This Agreement may be terminated at any time at or prior to the Closing:

        (a)        by written consent of Buyer and Sellers;

        (b)        by Sellers on the Closing Date if the conditions set forth in *Article V* have not been satisfied in all material respects or waived by Sellers;

        (c)        by Buyer on the Closing Date if the conditions set forth in *Article IV* have not been satisfied in all material respects or waived by Buyer;

        (d)        by Sellers, by notice to Buyer on or after February 28, 2020, if the Closing shall not have occurred;

        (e)        by Buyer or Sellers if any Governmental Authority shall have issued an order, judgment or decree or taken any other action challenging, delaying, restraining, enjoining, prohibiting or invalidating the consummation of any of the transactions contemplated by this Agreement; *provided, however,* that no Party shall have the right to terminate this Agreement pursuant to clause (b), (c), or (d) above if that Party is at the time in material breach of any provision of this Agreement.

    **7.4.2 Effect of Termination.** If the Closing does not occur as a result of any Party exercising its right to terminate pursuant to *Section 7.4,* then this Agreement shall be null and void and no Party shall have any further rights or obligations under this Agreement, except that a Party shall continue to be liable for any breach of this Agreement or any liability that has accrued prior to the date of termination or results from any event occurring prior to termination. Notwithstanding anything to the contrary contained in this Agreement, upon any termination of this Agreement pursuant to this *Paragraph 7.4,* Sellers shall be free immediately to enjoy all rights of ownership of the Acquired Assets and to sell, transfer, encumber or otherwise dispose of the Acquired Assets to any person without any restriction under this Agreement or claim by Buyer hereunder.

### 7.4.3  Termination Damages.

(a)         If this Agreement is terminated by Sellers as provided in *Section 7.4.1 (b)* or for other material breach of this agreement by Buyer, then Sellers shall retain the Deposit as liquidated damages on account of such termination, which remedy shall be the sole and exclusive remedy available to Sellers. Buyer and Sellers acknowledge and agree that (i) Sellers' actual damages upon the event of such a termination are difficult to ascertain with any certainty, (ii) that the Deposit is a reasonable estimate of such actual damages and (iii) such liquidated damages do not constitute a penalty.

(b)         If this Agreement is terminated as provided in *Sections 7.4.1 (a), (c), (d) or (e),* then within five (5) Business Days after termination Turner & Allen, P.C. shall return to Buyer in immediately available funds the Deposit.

**Section 7.4.4  Return of Documents and Confidentiality.** On termination of this Agreement, Buyer shall within ten (10) days following such termination return to Sellers all title, engineering and other data, reports, maps and other information furnished by Sellers or any Affiliates or Advisors of Sellers to Buyer or prepared by or on behalf of Buyer in connection with its due diligence investigation of the Acquired Assets, together with all copies of the foregoing, and an officer of Buyer shall certify same to Sellers in writing.

**Section 7.4.5  Damages.** Notwithstanding anything to the contrary in this Agreement, in no event shall any Party be entitled to receive any punitive, indirect or consequential damages.

### ARTICLE VIII
### MISCELLANEOUS

#### 8.1 Broker's Fees.

Except with respect to fees that may be owed to Seaport Global Securities, LLC, which shall be paid by Sellers, neither Party shall have any liability, contingent or otherwise, for brokers' or finders' fees relating to the sale of the Acquired Assets arising from the other Party, and each Party agrees to indemnify, defend and hold the other Party harmless from and against any such liability arising as a result of the indemnifying Party's actions.

#### 8.2 Governing Law.

This Agreement shall be governed by the laws of the State of Texas, without regard to its conflict of law principles.  All disputes arising from or relating to this Agreement shall be adjudicated in the courts sitting in Graham, Texas and each Party hereby consents such court's jurisdiction and to such venue.  **Each of Buyer and Sellers waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.**

#### 8.3 Specific Performance.

18735549.2
233559-10002

The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Buyer or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement.

### 8.4 Filings, Notices and Certain Governmental Approvals.

After Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, assignments, transfer orders, division orders, notices assumptions, releases and acquittances, and such other instruments, and shall take such further actions as may be necessary or appropriate to assure fully to Buyer or Sellers (including their successors and assigns) as the case may be, that the transactions described in this Agreement shall be completed and that all of the Acquired Assets intended to be conveyed under the terms of this Agreement are so conveyed, including such Acquired Assets that are improperly described herein or inadvertently omitted from this Agreement and/or the assignments executed contemporaneously herewith (including the exhibits attached to each).

### 8.5 Governmental Assignments.

Any assignments of the Acquired Assets filed with any state agency or with the Bureau of Land Management, although unqualified in form, shall be deemed to include all the terms and conditions of this Agreement as if set forth in full therein.

### 8.6 Entire Agreement.

This Agreement constitute the entire understanding between the Parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and prior agreements and understandings relating to such subject matter, whether oral or written.

### 8.7 Counterparts.

This Agreement may be executed by Sellers and Buyer in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same instrument, and the delivery of such counterparts may be via facsimile or email, which shall be as effective as hand delivery of original instruments.

### 8.8 Assignment.

The Buyer shall have the right to assign this Agreement to any affiliate or subsidiary of the Buyer without the consent or approval of the Sellers.

### 8.9 Interpretation

18735549.2
233559-10002

All references in this Agreement to Exhibits, Appendices, Annexes, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Appendices, Annexes, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to Article, Section or subsection hereof in which such words occur. The word "including" (in its various forms) means "including without limitation." All references to "$" or "dollars" shall be deemed references to United States Dollars. Each accounting term not defined herein will have the meaning given to it under GAAP, as in effect on the Execution Date. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices, Annexes and Exhibits referred to herein are attached to and made a part of this Agreement. Unless expressly stated otherwise, references to any Law or contract shall mean such Law or contract as it may be amended from time to time. Any reference herein to "person" or "persons" shall include both individuals and other legal entities as appropriate in the context in which such words are used.

*8.10 Notices.*

All notices and communications required or permitted hereunder shall be in writing and shall be delivered personally or sent by overnight courier or by certified United States Mail (with return receipt requested), postage prepaid or by electronic mail transmission, addressed as set forth below, and shall be deemed to have been given when delivered to the addressee in person, or by courier or certified mail, or transmitted by electronic mail transmission, or upon actual receipt by the addressee after such notice has either been delivered to an overnight courier or deposited in the United States Mail:

To Buyer:    CIRCLE RIDGE PRODUCTION INC.
P.O. Box 284
Graham, Texas 76450
Attn: Billy J. Briscoe
Tel: 940-521-9150
E-mail: bjbriscoe@gmail.com

18735549.2
233559-10002

To Sellers:        REMNANT OIL COMPANY, LLC
P.O. Box 5375
Midland, Texas 79704
Attn: E. Will Gray II
E-mail: will@remnantoil.com

with a copy to:

LOEB & LOEB LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
Attn: Bernard R. Given II
Tel: 310-282-2235
E-mail: bgiven@loeb.com

Either Party may, upon written notice to the other Party, change the address and person to whom such communications are to be directed.

### 8.11 Amendment.

This Agreement may be amended only by an instrument in writing executed by all of the Parties and expressly identified as an amendment or modification hereof.

### 8.12 Parties in Interest.

Nothing in this Agreement shall entitle any person other than the Parties to any claim, cause of action, remedy or right of any kind.

### 8.13 Preparation of Agreement.

Both Sellers and Buyer and their respective counsel participated in the preparation of this Agreement. In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

*[signature page follows]*

18735549.2
233559-10002

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLERS**

REMNANT OIL COMPANY, LLC

By: _E. W. Gray II_
Name: _E. Will Gray II_
Title: _C.E.O._

REMNANT OIL OPERATING, LLC

By: _C. W. Gray II_
Name: _E. Will Gray II_
Title: _C.E.O._

**BUYER**

CIRCLE RIDGE PRODUCTION INC.

By: _Billy J. Briscoe_
Name: Billy J. Briscoe
Title: Vice President

18735549.2
233559-10002

## EXHIBIT 'A' - SECTION I

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-060811 | GEORGE NIXON | 9/1/1944 | NA | W/2SW/4, SW/4NW/4, SE/4, E/2SW/4 OF SECTION 15, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND, DRICKEY QUEEN SAND UNIT, ROCK QUEEN UNIT | NM | CHAVES | USA LC-060812-A | VIRGIL O HOPP | 7/1/1948 | NA | SW/4 OF SECTION 8, SE/4 OF SECTION 10, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-068474 | FRANK SANER | 11/1/1947 | NA | N/2 OF SECTION 10, ALL OF SECTION 3, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-070336 | PHILLIPS PETROLEUM COMPANY | 5/1/1947 | NA | NW/4NW/4, S/2NW/4, NE/4NW/4 OF SECTION 22, N/2NW/4, SW/4NW/4 OF SECTION 1, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-070337 | PHILLIPS PETROLEUM COMPANY | 7/1/1948 | NA | SW/4 OF SECTION 10, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-072006 | AMERICAN REPUBLIC CORP | 1/1/1950 | NA | NE/4NE/4, SE/4SE/4, W/2E/2 OF SECTION 11, SE/4 OF SECTION 8, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA NM-02419 | CITIES SERVICE OIL COMPANY | 9/1/1950 | NA | E/2NE/4, SW/4NE/4 OF SECTION 33, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA NM-03927 | CITIES SERVICE OIL COMPANY | 3/1/1951 | NA | SE/4 OF SECTION 33, SW/4 OF SECTION 34, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA NM-04246 | KERR-MCGEE OIL INC | 3/1/1951 | NA | E/2SW/4, SW/4SW/4 OF SECTION 33, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT, ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B08822 | EARL G LEVICK | 9/19/1940 | NA | E/2NE/4 OF SECTION 26, E/2SE/4, SW/4SE/4, NW/4SW/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM VC0009 | CIRCLE RIDGE PRODUCTION CO | 3/1/1990 | NA | SW/4NE/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM B10417 | INTERCOAST PETROLEUM CO INC | 7/6/1943 | NA | NE/4SE/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| WEST CAP QUEEN SAND, DRICKEY QUEEN SAND UNIT, ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B10419 | BERNICE R PIATT | 7/6/1943 | NA | NW/4SW/4 OF SECTION 16, SE/4 OF SECTION 17, NE/4SW/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST; E/2NE/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM B10420 | WILLIAM SPURCK AND VADA SPURCK | 7/6/1943 | NA | NW/4SE/4, E/2NE/4, NW/4NE/4, SE/4NW/4, SE/4SW/4 OF SECTION 16, SE/4NE/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E00478 | TEXAS PACIFIC COAL & OIL CO | 8/10/1945 | NA | SW/4NW/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E00521 | LILLIAN V BROWNE | 9/10/1945 | NA | SE/4SW/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT, ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E1380 | TEXAS PACIFIC COAL & OIL CO | 7/10/1947 | NA | NW/4SE/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST; SE/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E01467 | TEXAS PACIFIC COAL & OIL CO | 9/10/1947 | NA | SW/4SE/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E2635 | L B HODGES | 5/10/1949 | NA | SW/4SW/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E02855 | GULF OIL CORP | 8/10/1949 | NA | NW/4NE/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E02858 | UNION OIL CO OF CALIF | 8/10/1949 | NA | NE/4SW/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E4810 | RALPH NIX | 12/11/1950 | NA | NW/4NW/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E5665 | GULF OIL CORP | 10/10/1951 | NA | SE/4SE/4 OF SECTION 16, NE/4NE/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E5988 | TEXAS PACIFIC COAL & OIL CO | 2/11/1952 | NA | NE/4, S/2NW/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RNAGE 31 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| DRICKEY QUEEN SAND UNIT, ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E06401 | CITIES SERVICE OIL COMPANY | 8/11/1952 | NA | N/2SE/4 OF SECTION 23, NE/4SW/4, NW/4SE/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST; W/2W/2 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E7661 | J M ZACHARY | 12/15/1953 | NA | SE/4NW/4, SE/4SW/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E7662 | GULF OIL CORP | 12/15/1953 | NA | NE/4NW/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E8333 | J M ZACHARY | 7/20/1954 | NA | NE/4NW/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | MORRIS R ANTWEIL ET AL | MALCO REFINERIES INC | 6/28/1989 | NA | NW/4SE/4, E/2NE/4 OF SECTION 22, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT, ZIMMERMAN | NM | CHAVES | MRS STELLA ZIMMERMAN ET AL | GULF OIL CORP | 2/26/1946 | BOOK 15, PAGE 408 | W/2 OF SECTION 11, NE/4, E/2SE/4 OF SECTION 20, W/2 OF SECTION 21, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT, ZIMMERMAN | NM | CHAVES | CLYDE H ZIMMERMAN ET AL | GULF OIL CORP | 3/6/1946 | BOOK 16, PAGE 36 | W/2 OF SECTION 11, NE/4, E/2SE/4 OF SECTION 20, W/2 OF SECTION 21, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | W H MEDLIN ET UX | BRUCE K MATLOCK | 12/6/1944 | BOOK 14, PAGE 379 | W/2NE/4 OF SECTION 22, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | MRS STELLA ZIMMERMAN ET AL | UNION OIL CO OF CALIF | 10/8/1947 | BOOK 25, PAGE 7 | NW/4NE/4, NE/4NW/4, N/2SW/4, SW/4SW/4, NW/4NW/4, S/2NW/4, SE/4NW/4 OF SECTION 14, N/2NE/4, SE/4NW/4, NE/4NW/4, S/2NE/4 OF SECTION 15, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND UNIT | NM | CHAVES | STATE OF NM B10411 | W E LEE & ALLIE M LEE | 7/2/1943 | NA | E/2NE/4 OF SECTION 8, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND | NM | CHAVES | USA LC-068371 | J R MILLER | 8/1/1949 | NA | NE/4, S/2SW/4, N/2SW/4 OF SECTION 17, TOWNSHIP 14 SOUTH, RANGE 31 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| WEST CAP QUEEN SAND | NM | CHAVES | USA LC-060812 | MALEC REFINERIES INC | 6/1/1949 | NA | NW/4 OF SECTION 17, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND | NM | CHAVES | USA LC-060712 | ED SCHOCKLEY | 5/1/1947 | NA | NE/4 OF SECTION 21, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND | NM | CHAVES | USA LC-060821 | FRANK A SANER | 11/1/1947 | NA | W/2SE/4, NE/4SE/4 OF SECTION 21, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | USA LC-068288 | ETHEL P ERWIN | 8/1/1951 | NA | N/2N/2, S/2S/2 OF SECTION 25, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | USA NM-02509 | SKELLY OIL CO | 11/1/1950 | NA | E/2NW/4 OF SECTION 27, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | USA NM-03844 | JOHN E COCHRAN, JR | 2/1/1951 | NA | NE/4 OF SECTION 27, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | USA NM-04385 | GEORGE P LIVERMORE INC | 2/1/1951 | NA | SE/4 OF SECTION 27, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B08318 | WILLIAM SPURCK | 9/11/1939 | NA | SW/4NW/4 OF SECTION 23, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B10418 | WILLIAM SPURCK & VADA SPURCK | 7/6/1943 | NA | SE/4SW/4, NE/4SE/4 OF SECTION 22, SW/4SE/4 OF SECTION 23, NW/4, N/2SW/4, E/2SE/4 OF SECTION 26, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B8605 | WILLIAM SPURCK & VADA SPURCK | 4/8/1940 | NA | NW/4SW/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B8459 | GULF OIL CORP | 1/4/1940 | NA | SE/4NE/4 OF SECTION 23, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B9359 | GREAT WESTERN DRIILLING CO | 10/11/1941 | NA | S/2SW/4, NE/4SW/4 OF SECTION 24, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B9495 | L H KENNEDY & LILLIAN E KENNEDY | 1/29/1942 | NA | SW/4NE/4 OF SECTION 26, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B9541 | GREAT WESTERN DRIILLING CO | 2/17/1942 | NA | ALL OF SECTION 36, NE/4SW/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM B11332 | BEN Q ADAMS | 7/10/1944 | NA | E/2SW/4 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 32 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM B11644 | LILLIAN V BROWNE | 12/11/1944 | NA | SE/4SE/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E35 | SOUTHERN PETROLEUM EXPLORATION | 1/10/1945 | NA | E/2NW/4 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E00473 | LILLIAN V BROWNE | 8/10/1945 | NA | N/2NW/4 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E04191 | ATLANTIC REFINING | 9/11/1950 | NA | SW/4SE/4 OF SECTION 22, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E4192 | J D HUNTER | 9/11/1950 | NA | SE/4SW/4 OF SECTION 19, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E5663 | GULF OIL CORP | 10/10/1951 | NA | SW/4SE/4, NW/4SE/4, SE/4SE/4, NW/4SW/4 OF SECTION 24, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | STATE OF NM E5758 | GULF OIL CORP | 11/10/1951 | NA | S/2SW/4 OF SECTION 26, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E7494 | SUPERIOR OIL CO | 10/20/1953 | NA | N/2NE/4, SW/4NE/4, W/2SE/4, NE/4SE/4, SE/4NE/4 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM E7659 | GULF OIL CORP | 12/15/1953 | NA | NW/4NE/4 OF SECTION 26, W/2NE/4 OF SECTION 22, E/2NW/4, NW/4NW/4, W/2NE/4, SW/4, SE/4SE/4 OF SECTION 23, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E8005 | W G ROSS | 3/16/1954 | NA | SE/4 OF SECTION 19, W/2W/2 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E8063 | EUGENE NEARBURG | 4/20/1954 | NA | SW/4NE/4 OF SECTION 19, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E8149 | SUPERIOR OIL CO | 5/18/1954 | NA | NE/4SW/4 OF SECTION 19, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E8226 | SUPERIOR OIL CO | 6/15/1954 | NA | SW/4SW/4 OF SECTION 19, TOWNSHIP 13 SOUTH, RANGE 32 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT | NM | LEA | STATE OF NM E9217 | H L FANNIN JR | 7/19/1955 | NA | NW/4NW/4 OF SECTION 31, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | W M TULK & CARRIE E TULK | GULF OIL CORP | 3/20/1946 | BOOK 16, PAGE 239 | S/2N/2, N/2S/2 OF SECTION 25, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| ROCK QUEEN UNIT | NM | CHAVES | CLYDE A BROWNING & LELA BROWNING | GULF OIL CORP | 1/26/1946 | BOOK 14, PAGE 418 | NE/4, S/2NW/4 OF SECTION 34, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA LC-062486 | J T BONNER | 4/1/1946 | NA | E/2 OF SECTION 5, ALL OF SECTION 4, ALL OF SECTION 9, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| OXY FEDERAL COM, WAKAN TANKA FEDERAL | NM | CHAVES | USA NM-080128 SEGREGATED OUT OF NM-2419 | CITIES SERVICE OIL COMPANY | 9/1/1950 | NA | SW/4 OF SECTION 27, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| KARANKAWA FEDERAL | NM | CHAVES | USA NM-91906 | CITIES SERVICE OIL COMPANY | 3/1/1951 | NA | SE/4 OF SECTION 28, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | USA NMNM-120355 | CELERO ENERGY II LP | 10/1/2008 | NA | SE/4 OF SECTION 34, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| WEST CAP QUEEN SAND | NM | CHAVES | STATE OF NM E3277 | PHILLIPS PETROLEUM COMPANY | 2/10/1950 | NA | SW/4SW/4 OF SECTION 16, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DRICKEY QUEEN SAND UNIT | NM | CHAVES | STATE OF NM VB1613 | BASIN LAND SERVICES | 3/1/2009 | `NA | SW/4NE/4 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| APACHE FEDERAL COM, FRIEND FEDERAL | NM | CHAVES | USA NM-17594 | ROBERT N FRIEND | 3/1/1973 | NA | SE/4 OF SECTION 20, NW/4 OF SECTION 21, SE/4 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| APACHE FEDERAL COM, DALPORT FEDERAL, FRIEND FEDERAL | NM | CHAVES | USA NM-17432 | PRISCILLA F GILMORE | 2/1/1973 | NA | SW/4 OF SECTION 20, LIMITED IN DEPTH FROM THE SURFACE TO A DEPTH OF 2,806 FEET, SW/4 OF SECTION 21, LIMITED IN DEPTH FROM THE SURFACE TO 2,850 FEET, NE/4 OF SECTION 30, LIMITED IN DEPTH FROM THE SURFACE TO A DEPTH OF 2,806 FEET, TOWNSHIP 13 SOUTH, RANGE 31 EAST |

**EXHIBIT 'A' - SECTION I**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

LANDS AND LEASES

| PROPERTY NAME | STATE | COUNTY | LESSOR | LESSEE | LEASE DATE | RECORDING DATA | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|
| DALPORT ARCO FEDERAL COM | NM | CHAVES | USA NM-35611 | PHILLIP C HOLT | 3/1/1979 | NA | LOTS 1, 2, E/2NW/4 OF SECTION 7, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DALPORT ARCO FEDERAL COM | NM | CHAVES | USA NM-349837 SEGREGATED OUT OF NM-153475 | AMERICAN REPUBLIC CORP | 1/1/1950 | BOOK 31, PAGE 205 | NE/4 OF SECTION 7, LIMITED IN DEPTH TO 2,790 FEET, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| DALPORT FEDERAL | NM | CHAVES | USA NM-98865 SEGREGATED OUT OF NM-1535A | ALVER C DUNCAN | 3/1/1967 | BOOK 112, PAGE 838 | NW/4, NW/4NE/4 OF SECTION 20, LIMITED IN DEPTH FROM THE SURFACE TO 2,806 FEET, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| OXY FEDERAL COM | NM | CHAVES | USA NM-80127 SEGREGATED OUT OF NM-03927 | CITIES SERVICE OIL COMPANY | 3/1/1951 | NA | NW/4, SE/4 OF SECTION 29, LIMITED IN DEPTH FROM THE SURFACE TO A DEPTH OF 2,750 FEET, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| OXY FEDERAL COM, WAKAN TANKA FEDERAL | NM | CHAVES | USA NM-80128 SEGREGATED OUT OF NM-02419 | CITIES SERVICE OIL COMPANY | 9/1/1950 | BOOK 35, PAGE 173 | NE/4, SW/4 OF SECTION 29, LIMITED IN DEPTH FROM THE SURFACE TO A DEPTH OF 2,750 FEET, TOWNSHIP 13 SOUTH, RANGE 31 EAST |

EXHIBIT "A" - SECTION II

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DTD EFF. February 2, 2020, BY AND BTWN REMNANT OIL CO., LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER

CAPROCK WATER EASEMENTS

| STATE | COUNTY | GRANTOR | GRANTEE | AGREEMENT DATE | LEGAL DESCRIPTION |
|-------|--------|---------|---------|----------------|-------------------|
| NM | CHAVES | STATE OF NM WR-85 | REMNANT OIL COMPANY, LLC | 12/20/2018 | ALL OF SECTION 24, TOWNSHIP 14S, RANGE 31E |
| NM | LEA | STATE OF NM WR-814 | REMNANT OIL COMPANY, LLC | 12/20/2018 | ALL OF SECTION 16, TOWNSHIP 13S, RANGE 32E<br>ALL OF SECTION 21, TOWNSHIP 13S, RANGE 32E<br>ALL OF SECTION 28, TOWNSHIP 13S, RANGE 32E<br>ALL OF SECTION 33, TOWNSHIP 13S, RANGE 32E |
| NM | CHAVES | STATE OF NM WM-192 | CELERO ENERGY II LP | 8/28/2013 | NW/4NW/4 OF SECTION 26, TOWNSHIP 13S, RANGE 31E |
| NM | CHAVES | STATE OF NM WM-191 | CELERO ENERGY II LP | 8/28/2013 | SE/4NW/4 OF SECTION 26, TOWNSHIP 13S, RANGE 31E |
| NM | CHAVES | STATE OF NM WM-190 | CELERO ENERGY II LP | 8/28/2013 | SE/4NW/4 OF SECTION 36, TOWNSHIP 13S, RANGE 31E |
| NM | CHAVES | STATE OF NM WM-221 | LEGACY RESERVES OPERATING LP | 5/6/2015 | E/2NE/4 OF SECTION 16, TOWNSHIP 14S, RANGE 31E |

**EXHIBIT A - SECTION III**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

**RIGHTS OF WAY**

| STATE | COUNTY | GRANTOR | GRANTEE | AGREEMENT DATE | RECORDING DATA | LEGAL DESCRIPTION |
|-------|--------|---------|---------|----------------|----------------|-------------------|
| NM | LEA | STATE OF NM RW-30958 | CELERO ENERGY II LP | 4/18/2008 | NA | SW/4SW/4 OF SECTION 16, NW/4NW/4, SW/4NW/4, NW/4SW/4, SW/4SW/4 OF SECTION 21, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| NM | CHAVES | STATE OF NM RW-24897 | CELERO ENERGY II LP | 5/5/1993 | NA | 0.6072 ACRES IN THE SE/4SE/4 AND 0.2783 ACRES IN THE NE/4SE/4 OF SECTION 32, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| NM | CHAVES | USA NM-84351 | CELERO ENERGY II LP | 3/1/2011 | NA | SE/4SE/4 OF SECTION 19, S/2S/2, NE/4SE/4 OF SECTION 20, SW/4NW/4 OF SECTION 21, S/2NW/4, NW/4NW/4N/2SW/4, SE/4SW/4, SW/4SE/4 OF SECTION 29, NE/4NE/4 OF SECTION 30, TOWNSHIP 13 SOUTH, RANGE 31 EAST; LOTS 1 THRU 4, SE/4NE/4, E/2SE/4 OF SECTION 4, LOT 1 OF SECTION 5, SW/4NE/4, NE/4SW/4, SE/4 OF SECTION 7, SE/4SE/4, SW/4SW/4 OF SECTION 8, E/2NE/4, S/2N/2, W/2SW/4 OF SECTION 9, N/2 OF SECTION 17, TOWNSHIP 14 SOUTH, RANGE 31 EAST |

**EXHIBIT A - SECTION III**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

**RIGHTS OF WAY**

| STATE | COUNTY | GRANTOR | GRANTEE | AGREEMENT DATE | RECORDING DATA | LEGAL DESCRIPTION |
|-------|--------|---------|---------|----------------|----------------|-------------------|
| NM | LEA | USA NM-55556 | LEGACY RESERVES OPERATING LP | 11/4/2014 | NA | E/2E/2 OF SECTION 13, TOWNSHIP 13 SOUTH, RANGE 30 EAST; LOT 4 OF SECTION 18, LOT 1, SW/4NE/4, E/2NW/4, W/2SE/4, SE/4SE/4 OF SECTION 19, SW/4SW/4 OF SECTION 20, S/2NW/4, NW/4SW/4 OF SECTION 29, E/2SE/4 OF SECTION 30, E/2E/2 OF SECTION 31, TOWNSHIP 13 SOUTH, RANGE 31 EAST; LOTS 1, 2, S/2NE/4, SE/4 OF SECTION 6, W/2NE/4 OF SECTION 7, TOWNSHIP 14 SOUTH, RANGE 31 EAST |
| NM | LEA | STATE OF NM RW-31939 | CELERO ENERGY II LP | 10/1/2010 | NA | SECTIONS 28 AND 29, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| NM | LEA | STATE OF NM RW-31938 | CELERO ENERGY II LP | 8/26/2010 | NA | SECTIONS 29 AND 30, TOWNSHIP 13 SOUTH, RANGE 32 EAST |
| NM | CHAVES | STATE OF NM RW-32225 | CELERO ENERGY II LP | 5/27/2011 | NA | S/2S/2 OF SECTION 26, W/2W/2 OF SECTION 35, TOWNSHIP 13 SOUTH, RANGE 31 EAST; W/2W/2 OF SECTION 2, TOWNSHIP 14 SOUTH, RANGE 31 EAST |

**EXHIBIT A - SECTION IV**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED FEBRUARY 20, 2019 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

SURFACE USE AGREEMENTS

| STATE | COUNTY | GRANTOR | GRANTEE | AGREEMENT DATE | RECORDING DATA | LEGAL DESCRIPTION |
|-------|--------|---------|---------|----------------|----------------|-------------------|
| NM | CHAVES | WANDA L WILLIAMS | CELERO ENERGY II LP | 11/1/2010 | NA | E/2, N/2SW/4, SE/4SW/4 OF SECTION 22, W/2, SE/4, S/2NE/4, NW/4NE/4 OF SECTION 23, SW/4, W/2SE/4, SE/4SE/4 OF SECTION 24, TOWNSHIP 13 SOUTH, RANGE 31 EAST |
| NM | LEA | LIMESTONE LIVESTOCK | CELERO ENERGY II LP | 5/10/2013 | NA | ALL OF SECTION 31, S/2 OF SECTION 30, ALL OF SECTION 32, TOWNSHIP 12 SOUTH, RANGE 32 EAST; ALL OF SECTIONS 1, 5, 6, 7, 8 AND 12, TOWNSHIP 13 SOUTH, RANGE 32 EAST; ALL OF SECTION 36, TOWNSHIP 12 SOUTH, RANGE 31 EAST |
| NM | CHAVES | STATE OF NM BL-0443-8 | LEGACY RESERVES OPERATING LPP | 11/14/2014 | NA | 6 ACRES OF LAND IN THE SW/4SW/4 OF SECTION 23, TOWNSHIP 13 SOUTH, RANGE 31 EAST |

**EXHIBIT 'A' – SECTION V**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED FEBRUARY 20, 2020, BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

CO2 PIPELINE

1.  A six (6) inch buried C02 Pipeline commencing at a connection point located in Section 35, Township 10 South, Range 31 East, Chaves County, New Mexico, extending in a southerly direction approximately 18.5 miles in length, ending at a point located in Section 25, Township 13 South, Range 32 East, Chaves County, New Mexico as approximately indicated on the plat attached hereto as Section II of Exhibit C.

2.  Please refer to Sections III and IV of Exhibit A attached hereto for a description of the respective C02 Pipeline Rights of Way and Access Rights associated with the C02 Pipeline described in item one (1) above.

EXHIBIT B

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| DQSU 0045 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501054 | |
| DQSU 0047 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501055 | |
| DQSU 0054 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521156 | |
| DQSU 0055 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521157 | |
| DQSU 0034 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501030 | |
| DQSU 0804 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501009 | |
| DQSU 0805 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500978 | |
| DQSU 0806 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500979 | |
| DQSU 0808 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500981 | |
| DQSU 0812 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501013 | |
| DQSU 0813 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500982 | |
| DQSU 0815 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500984 | |
| DQSU 0816 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500985 | |
| DQSU 0822 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500987 | |
| DQSU 0824 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500989 | |
| DQSU 0828 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501021 | |
| DQSU 0831 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500992 | |
| DQSU 0832 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500993 | |
| DQSU 0837 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000510158 | |
| DQSU 0704 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000529198 | |
| DQSU 0016 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500973 | |
| DQSU 0017 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500971 | |
| DQSU 0018 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500977 | |
| DQSU 0019 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500976 | |

EXHIBIT B

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20,  2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| DQSU 0022 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500969 | |
| DQSU 0023 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500972 | |
| DQSU 0024N | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500968 | |
| DQSU 0025 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500963 | |
| DQSU 0026 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501024 | |
| DQSU 0027 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501026 | |
| DQSU 0028 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501028 | |
| DQSU 0029 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501029 | |
| DQSU 0030 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501027 | |
| DQSU 0031 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501022 | |
| DQSU 0032 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501023 | |
| DQSU 0033 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501025 | |
| DQSU 0035 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501035 | |
| DQSU 0036 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501036 | |
| DQSU 0038 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501037 | |
| DQSU 0701 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000529196 | |
| DQSU 0006 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500903 | |
| DQSU 0007 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500902 | |
| DQSU 0008 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500901 | |
| DQSU 0009 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500900 | |
| DQSU 0012 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500894 | |
| DQSU 0014 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000500897 | |
| DQSU 0041 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501074 | |
| DQSU 0043 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $      46,093.75 | 3000501080 | |

EXHIBIT B

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20,  2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| DQSU 0040 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501070 | |
| DQSU 0039 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501075 | |
| DQSU 0001 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500925 | |
| DQSU 0002 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500923 | |
| DQSU 0003 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500922 | |
| DQSU 0004 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500924 | |
| DQSU 0005 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500926 | |
| DQSU 0011 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000500898 | |
| DQSU 0144 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521132 | |
| DQSU 0053 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501127 | |
| DQSU 0049 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501129 | |
| DQSU 0147 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521135 | |
| DQSU 0046 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000501064 | |
| DQSU 0056 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521153 | |
| DQSU 0057 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521154 | |
| DQSU 0058 | NM | CHAVES | 1.000000 | 0.75000002 | REMNANT OIL OPERATING,LLC | $ 46,093.75 | 3000521155 | |
| APACHE FEDERAL COM 0001 | NM | CHAVES | 0.875000 | 0.65625000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000521098 | |
| DALPORT ARCO FEDERAL COM 0001 | NM | CHAVES | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000520999 | |
| DALPORT FEDERAL 0001 | NM | CHAVES | 0.812500 | 0.60937500 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000520661 | |
| FRIEND FEDERAL 0001 | NM | CHAVES | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000520725 | |
| KARANKAWA FEDERAL 0001 | NM | CHAVES | 0.950000 | 0.71250000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000521118 | |
| NORTH CAPROCK CELERO QUEEN 031 | NM | CHAVES | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000500540 | WELLBORE ONLY |

EXHIBIT B

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20,  2020 BY AND BETWEEN
REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| NORTH CAPROCK CELERO QUEEN 022 | NM | LEA | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3002500207 | WELLBORE ONLY |
| NORTH CAPROCK CELERO QUEEN 026 | NM | LEA | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3002500201 | WELLBORE ONLY |
| NORTH CAPROCK CELERO QUEEN 027 | NM | LEA | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3002500209 | WELLBORE ONLY |
| NORTH CAPROCK CELERO QUEEN 028 | NM | LEA | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3002500200 | WELLBORE ONLY |
| OXY FEDERAL COM 0001 | NM | CHAVES | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000521097 | |
| OXY FEDERAL COM 0002 | NM | CHAVES | 1.000000 | 0.75000000 | REMNANT OIL OPERATING,LLC | $ 3,225.80 | 3000521095 | |
| ROCK QUEEN UNIT 0301 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000529192 | |
| ROCK QUEEN UNIT 0051 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000500866 | |
| ROCK QUEEN UNIT 0052 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000500865 | |
| ROCK QUEEN UNIT 0053 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000500864 | |
| ROCK QUEEN UNIT 0063 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000500859 | |
| ROCK QUEEN UNIT 0064 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING,LLC | $ 28,640.77 | 3000500860 | |
| ROCK QUEEN UNIT 0065 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500861 | |
| ROCK QUEEN UNIT 0066 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500862 | |
| ROCK QUEEN UNIT 0030 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500891 | |
| ROCK QUEEN UNIT 0029 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500883 | |
| ROCK QUEEN UNIT 0031 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500886 | |
| ROCK QUEEN UNIT 0032 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500888 | |
| ROCK QUEEN UNIT 0033 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500890 | |
| ROCK QUEEN UNIT 0034 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500887 | |

EXHIBIT B

ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT 0316 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529185 | |
| ROCK QUEEN UNIT 0049 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500874 | |
| ROCK QUEEN UNIT 0015 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500835 | |
| ROCK QUEEN UNIT 0025 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500816 | |
| ROCK QUEEN UNIT 0315 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529184 | |
| ROCK QUEEN UNIT 0035 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500872 | |
| ROCK QUEEN UNIT 0009 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500839 | |
| ROCK QUEEN UNIT 0010 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500841 | |
| ROCK QUEEN UNIT 0310 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529155 | |
| ROCK QUEEN UNIT 0041 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500867 | |
| ROCK QUEEN UNIT 0026 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500808 | |
| ROCK QUEEN UNIT 0701 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529159 | |
| ROCK QUEEN UNIT 0702 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529160 | |
| ROCK QUEEN UNIT 0703 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529161 | |
| ROCK QUEEN UNIT 0704 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529162 | |
| ROCK QUEEN UNIT 0705 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529166 | |
| ROCK QUEEN UNIT 0319 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529210 | |
| ROCK QUEEN UNIT 0321 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529211 | |
| ROCK QUEEN UNIT 0082 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500945 | |
| ROCK QUEEN UNIT 0084 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500937 | |
| ROCK QUEEN UNIT 0085 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500930 | |
| ROCK QUEEN UNIT 0086 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500931 | |
| ROCK QUEEN UNIT 0087 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500936 | |
| ROCK QUEEN UNIT 0088 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500939 | |

EXHIBIT B

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT 0089 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500943 | |
| ROCK QUEEN UNIT 0090 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500935 | |
| ROCK QUEEN UNIT 0091 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500932 | |
| ROCK QUEEN UNIT 0092 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500933 | |
| ROCK QUEEN UNIT 0093 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500934 | |
| ROCK QUEEN UNIT 0094 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500941 | |
| ROCK QUEEN UNIT 0095 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500942 | |
| ROCK QUEEN UNIT 0022 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500834 | |
| ROCK QUEEN UNIT 0305 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529149 | |
| ROCK QUEEN UNIT 0314 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529183 | |
| ROCK QUEEN UNIT 0037 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500875 | |
| ROCK QUEEN UNIT 0039 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500876 | |
| ROCK QUEEN UNIT 0043 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500881 | |
| ROCK QUEEN UNIT 0045 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500879 | |
| ROCK QUEEN UNIT 0046 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500878 | |
| ROCK QUEEN UNIT 0050 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500882 | |
| ROCK QUEEN UNIT 0023 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500813 | |
| ROCK QUEEN UNIT 0318 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002541526 | |
| ROCK QUEEN UNIT 0077 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500298 | |
| ROCK QUEEN UNIT 0028 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500819 | |
| ROCK QUEEN UNIT 0320 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002541527 | |
| ROCK QUEEN UNIT 0069 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500307 | |
| ROCK QUEEN UNIT 0096 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500928 | |
| ROCK QUEEN UNIT 0097 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500929 | |

EXHIBIT B
of 90

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT 0027 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500812 | |
| ROCK QUEEN UNIT 0106 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500284 | |
| ROCK QUEEN UNIT 0311 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529156 | |
| ROCK QUEEN UNIT 0011 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500844 | |
| ROCK QUEEN UNIT 0047 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500869 | |
| ROCK QUEEN UNIT 0048 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500868 | |
| ROCK QUEEN UNIT 0018 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500821 | |
| ROCK QUEEN UNIT 0019 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500820 | |
| ROCK QUEEN UNIT 0067 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500306 | |
| ROCK QUEEN UNIT 0068 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500304 | |
| ROCK QUEEN UNIT 0073 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500305 | |
| ROCK QUEEN UNIT 0024 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500809 | |
| ROCK QUEEN UNIT 0308 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529158 | |
| ROCK QUEEN UNIT 0013 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500832 | |
| ROCK QUEEN UNIT 0017 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500831 | |
| ROCK QUEEN UNIT 0020 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500830 | |
| ROCK QUEEN UNIT 0021 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500825 | |
| ROCK QUEEN UNIT 0309 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529154 | |
| ROCK QUEEN UNIT 0306 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529150 | |
| ROCK QUEEN UNIT 0070 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500309 | |
| ROCK QUEEN UNIT 0071 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500312 | |
| ROCK QUEEN UNIT 0078 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500310 | |
| ROCK QUEEN UNIT 0079 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500311 | |
| ROCK QUEEN UNIT 0007 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500294 | |

EXHIBIT B
70 of 90

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20, 2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| ROCK QUEEN UNIT 0002 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500286 | |
| ROCK QUEEN UNIT 0004 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500291 | |
| ROCK QUEEN UNIT 0005 | NM | LEA | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3002500292 | |
| ROCK QUEEN UNIT 0302 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529146 | |
| ROCK QUEEN UNIT 0303 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529147 | |
| ROCK QUEEN UNIT 0304 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529148 | |
| ROCK QUEEN UNIT 0317 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529194 | |
| ROCK QUEEN UNIT 0055 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500855 | |
| ROCK QUEEN UNIT 0059 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500854 | |
| ROCK QUEEN UNIT 0061 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500852 | |
| ROCK QUEEN UNIT 0062 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500851 | |
| ROCK QUEEN UNIT 0100 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500908 | |
| ROCK QUEEN UNIT 0102 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000500906 | |
| ROCK QUEEN UNIT 0706 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529167 | |
| ROCK QUEEN UNIT 0312 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529181 | |
| ROCK QUEEN UNIT 0313 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,640.77 | 3000529182 | |
| ROCK QUEEN UNIT 0098 | NM | CHAVES | 0.996728 | 0.74962145 | REMNANT OIL OPERATING, LLC | $ 28,641.47 | 3000500904 | |
| WAKAN TANKA FEDERAL 0001 | NM | CHAVES | 0.783500 | 0.58762500 | REMNANT OIL OPERATING, LLC | $ 3,225.98 | 3000521075 | |
| WAKAN TANKA FEDERAL 0002 | NM | CHAVES | 0.783500 | 0.58762500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000521082 | |
| WAKAN TANKA FEDERAL 0003 | NM | CHAVES | 0.905000 | 0.57848500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000521088 | |
| WAKAN TANKA FEDERAL 0004 | NM | CHAVES | 0.950000 | 0.65425000 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000521092 | |
| WEST CAP QUEEN SAND 0004 | NM | CHAVES | 1.000000 | 0.77031300 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501092 | |
| WEST CAP QUEEN SAND 0012 | NM | CHAVES | 1.000000 | 0.80937500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501079 | |

**EXHIBIT B**

**ATTACHED TO AND MADE A PART OF THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED EFFECTIVE FEBRUARY 20,  2020 BY AND BETWEEN REMNANT OIL COMPANY, LLC, AS SELLER, AND CIRCLE RIDGE PRODUCTION, INC., AS BUYER**

| PROPERTY | STATE | COUNTY | REMNANT WI | REMNANT NRI | OPERATOR | ALLOCATED VALUE | WELL API NUMBER | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| WEST CAP QUEEN SAND 0005 | NM | CHAVES | 1.000000 | 0.78509400 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501097 | |
| WEST CAP QUEEN SAND 0006 | NM | CHAVES | 1.000000 | 0.78509400 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501099 | |
| WEST CAP QUEEN SAND 0015 | NM | CHAVES | 1.000000 | 0.75875000 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501108 | |
| WEST CAP QUEEN SAND 0016 | NM | CHAVES | 1.000000 | 0.80937500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501107 | |
| WEST CAP QUEEN SAND 0021 | NM | CHAVES | 1.000000 | 0.75875000 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501109 | |
| WEST CAP QUEEN SAND 0017 | NM | CHAVES | 1.000000 | 0.80937500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501116 | |
| WEST CAP QUEEN SAND 0018 | NM | CHAVES | 1.000000 | 0.80937500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501115 | |
| WEST CAP QUEEN SAND 0020 | NM | CHAVES | 1.000000 | 0.80937500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501117 | |
| WEST CAP QUEEN SAND 0024 | NM | CHAVES | 1.000000 | 0.77262500 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501119 | |
| ZIMMERMAN 0002 | NM | CHAVES | 1.000000 | 0.71562400 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501102 | |
| ZIMMERMAN A 0001 | NM | CHAVES | 1.000000 | 0.69326100 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501110 | |
| ZIMMERMAN A 0003 | NM | CHAVES | 1.000000 | 0.69326100 | REMNANT OIL OPERATING, LLC | $ 3,225.80 | 3000501112 | |
| ZIMMERMAN A 0004 | NM | CHAVES | 1.000000 | 0.69326100 | REMNANT OIL OPERATING, LLC | $ 3,225.81 | 3000501113 | |

**EXHIBIT C - "To Come"**

**EXHIBIT D - "To Come"**

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Remnant Oil Company, LLC and | § | Case No. 19-70106 |
| Remnant Oil Operating, LLC, | § | Case No. 19-70107 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |
| | § | (Jointly Administrated under |
| | § | Case No. 19-70106) |

**ORDER (I) AUTHORIZING THE PRIVATE SALE OF DEBTORS' CAPROCK**
**ASSETS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE;**
**(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF THE**
**RELATED LEASES AND CONTRACTS PURSUANT TO SECTION 365**
**OF THE BANKRUPTCY CODE; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**") of Remnant Oil Company, LLC ("**Remnant Company**") and Remnant Oil Operating, LLC ("**Remnant Operating**" and together with Remnant Company, the "**Debtors**"), for entry of an order (this "**Order**") (I) Authorizing the Private Sale of Debtors' Caprock Assets Pursuant to Section 363 of the Bankruptcy Code; (II) Authorizing the Assumption and Assignment of the Related Contracts and Leases Pursuant to

Section 365 of the Bankruptcy Code; and (III) Granting Related Relief; the Court HEREBY

FINDS AS FOLLOWS:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334, venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409, and the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The

statutory predicates for the relief requested herein are sections 363, and 365 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended (the "**Bankruptcy Code**") and Rules

2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

**Rules**").

B.      Notice of the Motion was served by first-class mail, postage prepaid or by

electronic transmission upon (i) the Office of the United States Trustee for the Western District

of Texas; (ii) counsel for the Official Committee of Unsecured Creditors (iii) the Internal

Revenue Service and all state and local taxing authorities or recording offices that have a

reasonably known interest in the relief requested; (iv) all non-debtor parties to the Assumed and

Assigned Leases and Contracts;[*] (v) all parties who are known or reasonably believed, after

reasonable inquiry, to have asserted any lien, encumbrance, claim or other interest in the Assets;

(vi) known parties who previously expressed an interest in purchasing the Assets; (vii) all parties

set forth in the Debtors' Master Service List maintained in these cases (to the extent any party to

receive notice thereby has not received notice pursuant to sections (i) through (vi) above). The

Court finds the scope and manner of notice and service is proper, timely, adequate, and sufficient

in accordance with Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rules 2002,

6004, 6006, 6007 and 9014. No further notice of the Motion is necessary or required. A

---

[*] Capitalized terms used, but not defined, in this Order shall have the meaning ascribed to them in the Motion.

reasonable and appropriate opportunity to object or be heard regarding the relief requested in the Motion, including the assumption and assignment of the Leases and Contracts and the amounts necessary under section 365(b) of the Bankruptcy Code to cure defaults thereunder, has been afforded to all interested persons and entities.

C.      This Order constitutes a final order, within the meaning of 28 U.S.C. § 158(a).

D.      The Debtors have proposed the Sale, as a private sale, after thorough consideration of all viable alternatives, and have concluded that the Sale is supported by sound business reasons and is in the best interest of the creditors in these bankruptcy estates.

E.      The Debtors have full corporate power and authority to execute the PSA and all other documents contemplated thereby or otherwise necessary to close the PSA.

F.      The sale of the Assets to the Purchaser under the PSA, including without limitation, the assumption and assignment of the Contracts and Leases and the payment of any Cure Amount by the Purchaser, if any, reflects the exercise of the Debtors' sound business judgment and such acts are in the best interests of the Debtors, their estates and creditors.

G.      The Court finds that the Debtors have articulated good and sufficient business justification for the sale of the Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization, and for the assumption and assignment of the Contracts and Leases pursuant to section 365 of the Bankruptcy Code, in that, among other things: (i) the Purchase Price under the PSA is the best obtainable under the circumstances; (ii) in the absence of a prompt sale of the assets under the PSA, the fair value of the assets may not be realized; and (iii) unless a sale to the Purchaser is concluded expeditiously as provided for in the Motion and under the PSA the value of the Assets may decline and administrative expenses will continue to increase, thereby resulting in the Debtors' creditors realizing a decreased distribution.

H.     The terms and conditions of the PSA are fair, reasonable and appropriate under the circumstances.

I.     The PSA was vigorously negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, from arm's length bargaining positions. The PSA sets forth all of the terms of the agreement between the Debtors and the Purchaser.

J.     The Cure Amount applicable to the Contracts and Leases is the sole amount necessary to cure any default, and to pay all actual or pecuniary losses that have resulted from any of the Debtors' defaults under, the Contracts and Leases, including within the meaning of section 365(b)(1)(A) of the Bankruptcy Code.

K.     The Purchaser has provided adequate assurance of the Purchaser's future performance under the Contracts and Leases within the meaning of section 365(b)(1)(C) and 365(0(2)(B) of the Bankruptcy Code. The assumption and assignment of the Contracts and Leases pursuant to the PSA is in the best interest of the Debtors, their creditors, and their estates.

L.     The Debtors adequately notified the counterparties to the Contracts and Leases that the Debtors intend to assign the Contracts and Leases to the Purchaser. The counterparties to the Contracts and Leases were provided sufficient notice and opportunity to object to the Debtors' proposed assignment of the Contracts and Leases. The Purchaser has demonstrated adequate assurance of future performance of all Leases and Contracts within the meaning of section 365 of the Bankruptcy Code. Any objections to the determined cure costs, to the extent not otherwise resolved, are hereby overruled.

M.     The parties' negotiations for the sale of the Assets under the PSA were not collusive in any manner whatsoever within the contemplation of section 363(n) of the Bankruptcy Code and the Purchaser has not violated section 363(n) of the Bankruptcy Code.

Further, the parties' agreement set forth in the PSA was not reached as a result of any collusion or other conduct within the contemplation of section 363(n) of the Bankruptcy Code. Neither the Debtors nor the Purchaser have engaged in any other conduct that would cause or permit the PSA to be avoided under section 363(n) of the Bankruptcy Code. Rather, the Purchaser and its representatives have acted properly and in good faith in all aspects relating to the PSA.

N.    The Purchaser is not an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code and the Purchaser is a good faith purchaser within the meaning of, and is entitled to, all of the protections of section 363(m) of the Bankruptcy Code, and is entitled to and may rely upon all the protections afforded thereby.

O.    The Debtors are the sole and lawful owners of the Assets. The transfer of the Assets, and the assignment of the Contracts and Leases as set forth in this Order and the PSA, (a) constitute legal, valid and effective transfers of property of the Debtors' estates to the Purchaser and (b) at the Closing described in the PSA, shall vest the Purchaser with all right, title, and interest of the Debtors in and to the conveyed Assets free and clear of all interests, liens, claims, encumbrances, debts arising under, relating to, or in connection with any act of the Debtors or claim (as defined in section 101(5) of the Bankruptcy Code), liabilities, demands, options, restrictions, interests and matters of any kind, whether arising prior to or subsequent to the commencement of these Chapter 11 cases and as otherwise provided under section 363(f) of the Bankruptcy Code.

P.    The Purchase Price constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code.

Q.    The transactions and agreements set forth in the PSA regarding the Assets do not: (i) result in the Purchaser assuming any liabilities of the Debtor other than as set forth in the PSA; (ii) cause the continuation of the Debtors' business by the Purchaser; (iii) cause the consolidation or *de facto* merger between the Debtors and Purchaser; or (iv) cause the Purchaser to be liable in any manner for any successor liability of any kind or character other than as set forth in the PSA.

Therefore, the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

2.    The Debtors have in all respects satisfied all notice and service obligations set forth in the Bankruptcy Code and Bankruptcy Rules, and have complied with the PSA.

3.    The terms and conditions and transactions contemplated by the PSA are hereby authorized and approved in all respects, and the Sale pursuant to the PSA is hereby approved, authorized and directed under sections 105, 363(b), (f)(1)—(5), and (h) of the Bankruptcy Code, subject to the terms of this Order and the PSA.

4.    Pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors are hereby authorized, directed and empowered without further Court order to enter into, and fully perform under, consummate, and implement the PSA; to execute all additional instruments and documents that may be reasonably necessary or desirable to close and implement the PSA; to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, any or all of the Assets, the Contracts and Leases, and to fully perform and close all

aspects of the PSA. The Debtors are hereby authorized and directed to perform each of their respective covenants and undertakings as provided in the PSA prior to or after closing without further order of the Court.

5.      Pursuant to sections 105(a) and 363(b)(1)-(5), and (h) of the Bankruptcy Code, the Assets are and shall be transferred to the Purchaser upon the Closing under the PSA free and clear of all liens, claims, interests and encumbrances except as expressly permitted by the PSA without reduction of any consideration to Seller under the PSA, and, in addition, free and clear of any rights of consent of any non-Debtor party relating to any of the Assets, including the Contracts and Leases, which consent is hereby deemed given for all purposes.

6.      All liens, claims, interests and encumbrances shall attach to the proceeds of the Sale in the same manner, in the same order of priority, and with the same validity, force and effect they now have as against the Assets, if any, and the distribution of any and all such proceeds hereafter may be accomplished only upon notice, opportunity for a hearing, and an order of the Court.

7.      Except as expressly permitted by the PSA or this Order, pursuant to section 105 of the Bankruptcy Code, all persons, entities and parties in interest holding or asserting any liens, claims, interests or encumbrances with respect to or in connection with the Assets or the Contracts and Leases are hereby enjoined and forever barred from asserting any such interests, liens, claims, or encumbrances against the Purchaser, its successors or assigns, or the Assets or the Contracts and Leases.

8.      Further, and except as expressly provided in the PSA or this Order, the Purchaser is not assuming, nor shall it in any manner whatsoever be or become liable or responsible for, as a successor or otherwise, any liabilities, debts or obligations of the Debtors, or any and all

liabilities, debts or obligations in any manner whatsoever relating to or arising from the Assets or the Debtors' ownership, possession, operation or use of the Assets, including without limitation, the Contracts and Leases, prior to the Closing, or any liabilities calculable by reference to the Debtors or their assets or operations, or relating to continuing conditions existing on or prior to consummation of the transactions contemplated by the PSA, which liabilities, debts and obligations are hereby extinguished insofar as they may give rise to successor liability or liability with respect to the Assets, Contracts or Leases; provided, however, that nothing herein shall limit Purchaser's liability, responsibility, and obligation for the Assumed Liabilities (as defined in the PSA), any other obligations, liabilities, or responsibilities assumed by or assigned to Purchaser under the PSA, and Purchaser's obligations, liabilities, and responsibilities pursuant to, and to perform under, the PSA, all of which shall be and remain liabilities, responsibilities, and obligations of Purchaser.

9.      No person or entity, including without limitation, any federal, state or local governmental agency, department or instrumentality, shall assert against the Purchaser or its successors in interest any liability, debt or obligation relating to or arising from the Assets or the Debtors' operation or use of the Assets or the Contracts and Leases (except for any Cure Amount the Purchaser is obligated to pay pursuant to the PSA) or any liabilities calculable by reference to the Debtors or their assets or operations, and all such persons and entities are hereby enjoined and forever banned from asserting any such claims, interests, liabilities, debts or obligations against the Purchase; subject however, to the proviso set forth in the immediately preceding paragraph of this order.

10.      The Debtors are hereby authorized, in accordance with sections 365 and 363(c)(2) of the Bankruptcy Code, as applicable, and subject to the terms of the PSA, to (a) assume and

assign to the Purchaser each of the Contracts and Leases pursuant to the provisions of section 365 of the Bankruptcy Code, free and clear of all interests, liens, encumbrances and claims, and (b) execute and deliver to the Purchaser without further Court Order such documents or other instruments as may be necessary to assign and transfer such Contracts and Leases to the Purchaser. The Cure Amounts of $0.00 are hereby approved as the amounts sufficient to cure all actual and pecuniary defaults, if any, under the Contracts and Leases as required under section 365(b)(1) of the Bankruptcy Code. The Purchaser shall pay any Cure Amounts arising in connection with the Debtors' assumption and assignment of the Contracts and Leases and shall otherwise comply with the PSA.

11.     The Contracts and Leases shall, upon assumption and assignment to the Purchaser, be deemed to be valid, binding and in full force and effect, and enforceable in accordance with their terms against the non-Debtor parties thereto, and pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any future liability arising only and completely after the Effective Time with respect to such Contracts and Leases.

12.     All non-Debtor parties to any of the Contracts and Leases are hereby enjoined and forever barred from asserting against the Purchaser any default existing as of, or prior to, the Effective Time.

13.     On and after the Closing, all persons or entities holding any interests, liens, claims and encumbrances in or on the Assets shall execute such documents and take all such other actions as may be deemed necessary by the Purchaser to release such interests, liens, claims or encumbrances, if any, against the Assets, to the extent such interests, liens, claims and encumbrances may have been recorded or may otherwise exist. The Debtors and Purchaser are each authorized to execute, and to the extent necessary file in the public records, such documents

and take all such other actions as may be necessary to extinguish and remove any interests, liens, claims and encumbrances against the Assets. To the extent any persons or entities holding any such interests, liens, claims and encumbrances refuse to execute documents necessary for the Purchaser to obtain any of the Assets free and clear of such interests, liens, claims and encumbrances, this Court shall retain jurisdiction to, among other things, enforce this Order against such parties to cause such interests, liens, claims or encumbrances to be fully discharged and released.

14.     The Purchaser and the Debtors are authorized to file this Order of record in any county, state or federal records. Each and every federal, state, and local governmental agency or department hereby is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the PSA.

15.     As to the PSA and the Assets transferred thereby, this Order (a) is and shall be effective as a determination that, on the Closing Date, all liens, claims, encumbrances and other interests existing as to the Assets prior to the Closing Date, and claims, have been unconditionally released, discharged, extinguished and terminated for all purposes, and that the conveyance described in this Order has been effected, and (b) is and shall be binding upon and govern the acts of all persons, entities and Parties in Interest, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of deeds of trust and mortgages, recorders of deeds, registrars of deeds or intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

16.     If any person or entity that has filed financing statements, or other documents or agreements evidencing any interests, liens, and claims against the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or other releases of liens or other interests which the person or entity has with respect to the Assets, the Debtor or its successor is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets.

17.     All entities that are presently, or on the Closing Date may be, in possession of any of the Assets, are hereby directed to surrender possession of said Assets to the Purchaser on the Closing Date.

18.     This Court retains jurisdiction (a) to enforce and implement the terms and provisions of the PSA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) to resolve any disputes arising under or related to the PSA, including any disputes between the Purchaser and any third party, except as otherwise provided therein, and (c) to interpret, implement and enforce the provisions of this Order.

19.     The PSA has been entered into by the Purchaser in good faith and the Purchaser is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein of the sale shall neither affect the validity of the sale nor the transfer of the Assets to Purchaser, free and clear of interests, claims and encumbrances, nor the other provisions of this Order that benefit the Purchaser, unless such authorization is stayed before the Closing Date pending appeal. Section 363(n) of the Bankruptcy Code does not apply,

and no Party in Interest shall be entitled to seek to avoid the sale of the Assets under the PSA, in whole or in part, or to seek any other relief pursuant thereto.

20.     The terms and provisions of the PSA, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including but not limited to the non-debtor parties to the Contracts and Leases to be assigned to the Purchaser pursuant to the PSA, persons or entities asserting any interests, liens, and claims, and persons or entities asserting a claim against or interest in the Debtors' estates or any of the Assets to be sold to the Purchaser pursuant to the PSA, notwithstanding any subsequent appointment of any trustee for the Debtors under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise shall be binding in all respects.

21.     The failure specifically to include any particular provisions of the PSA in this Order shall not diminish or impair the efficacy or enforceability of such provision, it being the intent of the Court that the PSA be authorized and approved in its entirety. Neither the Purchaser nor the Debtor shall have an obligation to close the transaction until all conditions precedent in the PSA to each of their respective obligations to close the transactions shall have been met, satisfied or waived in accordance with the PSA.

22.     The PSA may be modified, amended or supplemented by agreement of the Debtors and Purchaser without further order of the Court, provided that any such modification, amendment or supplement is not materially adverse to the Debtors, their creditors or their estates. Further, the PSA may be amended, without further Court Order, to incorporate any matters set forth in this Order not previously or completely set forth in the PSA. The Debtors, with the

agreement of the Purchaser, may complete, modify, substitute, and otherwise change the Schedules or Exhibits attached to the PSA and enter into documents or agreements necessary to close the transaction contemplated by the PSA without further order of the Court. As provided in the PSA, the Debtors and Purchaser may schedule or reschedule the Closing Date or cause the Closing Date to occur on one or more dates as they deem appropriate under the circumstances.

23.     Neither the Purchaser nor its successors, assigns and advisors shall have or incur any liability to, or be subject to any action by the Debtors, their estates or any of their predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution or delivery of the PSA and the entry into and consummation of the sale, other than (with respect to the Purchaser only) the Assumed Liabilities being assumed by the Purchaser pursuant to the PSA. Because the entry into and consummation of the PSA constitutes the exercise by the Debtors of sound business judgement, the Debtors, their respective members, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estate or any holder of a claim or interest for any act or omission in connection with, related to, or arising out of the negotiations of the PSA or the consummation of the transactions contemplated thereunder, other than liability arising out of or relating to any act or omission that constitutes a breach of the PSA willful misconduct, fraud or gross negligence, in each case as determined by a court of competent jurisdiction.

24.     Following the Closing Date, Purchaser shall make available to the Debtors (and any successor to the Debtors), business records (or copies) acquired by Purchaser in the sale and transfer to Purchaser of the Assets to the extent requested by the Debtors to complete their tax returns, satisfy other statutory and regulatory requirements imposed on the Debtors' businesses prior to the Closing Date, and to perform their duties and obligations in this case.

25.     Nothing in this Order or the PSA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the PSA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

26.     Notwithstanding any other provision in the Motion, this Order or any implementing use, sale, or transfer documents (collectively, the "Sale Documents"), any sale, assignment and/or transfer of any interests in contracts, leases, covenants, operating rights agreements, rights-of-use and easements, and rights-of-way or other interests or agreements (a) with the federal government; (b) involving (i) federal land or minerals; (collectively, the "**Federal Leases**"), will be ineffective with respect thereto absent the consent of the United States. The Debtors and the Purchaser agree to comply with all applicable bankruptcy and non-bankruptcy law with respect to the Federal Leases, and nothing in the Sale Documents shall otherwise affect any decommissioning obligations and financial assurance requirements under the Federal Leases as determined by the United States (as provided for under applicable law and the Federal Leases) that must be met by the Debtors and/or the Purchaser, as applicable. Moreover, nothing in this Order or the Sale Documents shall be interpreted to require the United States to novate, approve or otherwise consent to the assumption, sale, assignment and/or transfer of any interests in the Federal Leases.

27.     For the avoidance of doubt, in order to obtain the consent of the United States to the assumption, sale, assignment and/or transfer of any interests in a Federal Lease, all existing defaults under such Federal Lease, including, without limitation, any outstanding rents or royalties known and satisfactorily documented to date, plus any accrued and unpaid interest lawfully chargeable against any such underpayments of royalty interests, must be paid (i.e., assumed and/or cured, to the extent appropriate), and any reporting requirements or outstanding reports must be submitted and nothing in this Order, or the Sale Documents, shall be interpreted to set Cure Costs for the Federal Leases.

28.     Notwithstanding any other provision herein the United States will retain, and have, the right to audit and/or perform any compliance review related to the Federal Leases and, if appropriate to collect from the Debtors or their successors and assigns (including the Purchaser and Reorganized Debtors, if applicable) and under applicable federal regulations any additional monies owed by the Debtors that accrued prior to the transfer or assignment of the Federal Leases without those rights being adversely affected by these bankruptcy proceedings. The Debtors, and their successors and assigns (including the Purchaser) and Reorganized Debtors, if applicable)) will retain all defenses and/or rights, other than defenses and/or rights arising from the bankruptcy, to challenge any such determination: provided, however, that any such challenge, including any challenge associated with this bankruptcy proceeding, must be raised in the United States' administrative review process leading to a final agency determination by the United States Department of the Interior Office of Natural Resources Revenue. The audit and/or compliance review period shall remain open for the statute of limitations period applicable by law. In addition, nothing in the Assumption and/or Assignment Order, or Sale Order, or the Purchase and Sale Agreement(s) addresses or shall otherwise affect any plugging and

abandonment obligations and financial assurance requirements under the Federal Lease(s), as determined by the Department of the Interior of the United States, that must be met by the Debtors or their successors and assigns (including the Purchaser) going forward.

###

**Submitted by:**
Bernard R. Given II
State Bar No. 07990180
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA  90067
Telephone: 310.282.2000
Facsimile: 310.282.2200
Email:  bgiven@loeb.com